UNITED STATES, Appellee

v

JACK L. WESHENFELDER, Major, U. S. Army, Appellant

20 USCMA 416, 43 CMR 256

No. 23,593

March 19, 1971

*Captain Robert B. Harrison, III,* argued the cause for Appellant, Accused. With him on the brief were *Colonel George J. McCartin, Jr., Captain Thomas R. Maher,* and *Captain William W. Rittenhouse.*

*Lieutenant Colonel Ronald M. Holdaway* argued the cause for Appellee, United States. With him on the brief were *Colonel David T. Bryant* and *Captain Mark Rosenberg.*

## Opinion of the Court

FERGUSON, Judge:

Although originally charged with five separate offenses, the accused was found guilty by a general court-martial of only one specification each of violating a lawful general regulation, by storing Military Assistance Command Vietnam (MACV) forms in an unlocked desk (specification 2, Charge II), and unlawfully carrying a concealed weapon (specification 1, Charge III), in violation of Articles 92 and 134, Uniform Code of Military Justice, 10 USC §§ 892 and 934, respectively. He was sentenced to be reprimanded in writing and to forfeit $1,000.00 pay per month for one month. The convening authority approved the findings and only so much of the sentence as provided for a reprimand and forfeiture of $500.00. The Court of Military Review, which reviewed the case pursuant to a certification from the Judge Advocate General of the Army (Article 69, Code, supra, 10 USC § 869), affirmed the findings and sentence. The case is before this Court by cer-

tification, pursuant to Article 67(b) (2), Code, supra, 10 USC § 867, which requests that action be taken with respect to the following issues:

I. Was the Court of Military Review correct in holding that the search of appellant's person was legal and that the pistol seized during the search was admissible in evidence?

II. Was the Court of Military Review correct in holding that the search of appellant's desk was legal and that the items seized during the search were admissible in evidence?

The evidence relative to the two searches in question was supplied through the testimony of Agents Trejo and Wells, Criminal Investigations Detachment, and the deposition of Colonel Walsh (Prosecution Exhibit 7), Commanding Officer, 4th Transportation Command.

Agent Trejo testified that on June 2, 1969, while he was the duty investi-

gator in the Saigon area, he received a telephone call from an unknown person who identified himself as a Sergeant (E–7) and as a military intelligence agent.[1] Agent Trejo had never dealt with the Sergeant before and, in fact, did not know him. According to Trejo, the caller advised that he had learned from an undisclosed informant that "a Major and a Specialist had attempted to sell some Ration Cards at the Copa Cabana Bar and that they were going to return that afternoon to deliver the Ration Cards during the lunch hour." The caller agreed to meet Trejo in the bar and they devised a series of signals by which each could surreptitiously recognize the other. Trejo then contacted Agents Wells, Maneeley, and Morgan, and requested their assistance.[2] When Trejo and Wells entered the Copa Cabana Bar, a Major was seated at the bar by himself. Trial counsel then inquired:

"Q. Now when you say the Major, who do you mean?

"A. Major Weshenfelder. The Sergeant was sitting where he said he'd be. We did not see any Specialist in the bar, but we noticed there was a hat next to the Major's hat with E–5 ——

"Q. Where were these hats?

"A. They were on top of the bar next to the Major. The Sergeant then got up and asked the Major for a light which was the password that he was supposed to let us know that this was the man.

"Q. You had this information before?

"A. Yes, then he made sure that we knew that the Specialist was in the back room by saying, 'Major, do you want me to buy your friend in the back room a drink?' or 'Major, let me get your friend in the back room a drink.' So at this time I proceeded to go to the latrine through the back room and the Specialist was talking to a Vietnamese national in the back room. I could not overhear the conversation.

"Q. How do you know that he was talking to him? Did you see him visually?

"A. They were the only two in the back room and they were real close to each other and you could see that they were carrying on a conversation. While I was in the latrine, the Sergeant came in and advised me that the Specialist and the Major were armed and that they had the Ration Cards in their possession, so I returned back to the bar where Mr. Wells was sitting and I advised him of the information that I had received. A few minutes later the Specialist came out and sat next to the Major and they carried on a conversation. He kept pointing in our direction and I believe ——

"Q. Who is 'he'?

"A. The Specialist. I believe the Major made a remark, 'No, they couldn't be,' so then I advised Mr. Wells that I suspected we had been identified as CID agents and they were apprehended as they walked out of the place a short time later. As they started to leave, we walked up behind them. I apprehended the Specialist. Mr. Wells apprehended the Major. We took them around the corner to where our vehicle was parked. I searched the Specialist and I found some Ration Cards and some Identification Cards in his pockets."

After the cards, obtained from the search of the Specialist (Messer) were introduced into evidence (Prosecution Exhibits 1–4), trial counsel then inquired:

"Q. What did you do at that time, Mr. Trejo?

"A. I advised the Specialist and the Major of their rights. The Major requested counsel and requested Captain Woods by name. They were taken to our office where Captain Woods was notified of the Major's request.

---

[1] The Sergeant did not testify at the trial.

[2] Agents Maneeley and Morgan did not testify at the trial.

"Q. Did you question him before Captain Woods came?

"A. No, I did not ask him any questions.

"Q. OK, did you inform anybody about this particular apprehension?

"A. Yes, Mr. Wells and I proceeded to Camp Davies where the Major lived to obtain permission to conduct a search of his quarters. When we arrived there, since I had apprehended the Specialist, I continued to his company and Mr. Wells stayed and talked to Lieutenant Col[o]nel Delmas, I believe was his name, who is the Installation Coordinator.

"Q. OK, then as far as you are concerned you terminated your particular case in reference to Major Weshenfelder at this time?

"A. That is correct.

"TC: OK, your witness."

On cross-examination, Trejo acknowledged that the only basis for his action on June 2d was the information given to him by the previously unknown Sergeant. He made no previous investigation of his own, before going to the bar, to ascertain whether in fact the information he had received was reliable. In his opinion, there was sufficient justification to arrest and search the Major and the Specialist from the fact that the Sergeant was sitting in the bar where he had said he would be, the Major was also there, and the Sergeant pointed out the Major. Prior to this time he had no knowledge or indication that Major Weshenfelder might be involved in illicit activity. Trejo also admitted that he learned from the Sergeant that his knowledge of the affair came from an, as then, unidentified Vietnamese national and not from personal conversation with the Major or the Specialist. The Vietnamese, however, according to Trejo, was a friend of the Sergeant's who had allegedly previously supplied him with intelligence information. None of the intelligence information had ever been forwarded to Trejo for any of his investigations. While in the bar, Trejo did not personally observe the Major or the Specialist attempt to sell ration cards or any other items, or engage in any suspicious conversations or activity. Trejo had never before had an investigation involving the Copa Cabana Bar.

Upon questioning by the military judge, Trejo conceded that for all he knew the information supplied to him could have been a "flight into fantasy" —"a fairy tale." The Sergeant did not inform Trejo of the name of his source and Trejo knew nothing about him.

Agent Wells testified that all of the information he had about the case, prior to his apprehension and search of Major Weshenfelder, came from Agent Trejo. He and Trejo entered the bar together and the other two men remained outside. At that time he was not acquainted with either the accused or Specialist Messer. As the two suspects left the bar, Trejo motioned for him to follow and "we apprehended them outside the bar." Wells identified himself to Major Weshenfelder, informed him he was under apprehension, and searched him. An unloaded .38 caliber revolver was found "under his shirt in the waistband of his [the accused's] trousers." No ammunition or *ration cards* were found on the accused's person. Later that afternoon, Wells conducted a search of the accused's quarters at Camp Davies and of his office. He obtained permission for the search from the "Post Commander at Camp Davies where the Headquarters is located." In the *unlocked* desk, he found a number of ration cards. The search of the billets was negative.

On cross-examination, Wells testified that he accompanied Trejo to the Copa Cabana Bar "to observe a transaction and perhaps to effect an apprehension." While in the bar he did not observe any activity which might be considered as illegal. His basis for apprehending Major Weshenfelder was "what I had been told by Mr. Trejo— that he was engaged in illegal activity." He had no reason to believe that the Major was armed other than

he was told this by Trejo. He obtained permission to search the accused's billets because "[w]e were still looking for any evidence that we might find showing that he was engaged in the wrongful disposition of Government property—MACV Ration Cards." His reason for believing that the accused might be involved in illegal activity concerning ration cards and might have some in his billets was based on "[h]is being in the company of Specialist Messer, who was found to be in the possession of excess MACV Ration Cards." When Wells obtained permission to search, he did not actually speak with the commanding officer but, rather, he conveyed his information telephonically to a Lieutenant Colonel Goosman, the accused's supervisor.[3] Wells testified: "I gave him just a very quick briefing as to what the investigation was about and what we had done up to that time." Goosman was informed that ration cards had been taken from Specialist Messer. The cards were not, however, shown to Lieutenant Colonel Goosman or to Colonel Walsh. According to Wells, Lieutenant Colonel Goosman informed him that Colonel Walsh had authorized the searches of the billets and the desk.

When questioned by the military judge whether he had inquired of Trejo as to the credibility or reliability of his information, Wells replied: "I asked him where he had gotten his information. He said he had gotten it from a source which to my understanding was someone. who did not wish to have his identity revealed. I had no reason to question him any further."

In his deposition, Colonel Walsh revealed that he had been informed by the then Chief of Staff of the Command, *Colonel Godfrey*, "that Major Weshenfelder and an enlisted man by the name of Messer had been apprehended by the CID for allegedly misdealing or trying to sell some ration cards and ID cards." Weshenfelder was responsible for the issuance of ration cards and ID cards within the Command. Colonel Walsh did not speak with the CID agents personally. He was told that ration cards were recovered from Messer, the enlisted man, but not from the accused. It was on the basis of the information relayed to him by Colonel Godfrey that he authorized the search. Prior to that time he did not suspect Major Weshenfelder of any illegal activity, nor was he aware of any illegal traffic in ration cards or ID cards among members of his Command. The purpose of the search was to determine "if there were any other ramifications because of malfeasance of officers in connection with ration cards or ID cards." Colonel Godfrey was not called to testify.

Defense counsel's objection to the admission in evidence of the pistol found on the accused at the time of his apprehension and the ration cards found in the search of the accused's unlocked desk, was overruled by the military judge. The Court of Military Review held that the search of the accused was based on a lawful arrest, the search of the desk was properly authorized following a showing of probable cause to search, and that the evidence obtained thereby was, therefore, admissible.

I

Article 7(b), Code, supra, 10 USC § 807, provides:

"Any person authorized under regulations governing the armed forces to apprehend persons subject to this chapter or to trial thereunder may do so upon reasonable belief that an offense has been committed and that the person apprehended committed it."

An apprehension, however, may not be used as a pretext to search for evidence of crime (United States v Lefkowitz, 285 US 452, 76 L Ed 877, 52 S Ct

---

[3] Lieutenant Colonel Goosman testified on the merits as a character witness for the accused. He was not questioned as to his role in authorizing the searches by Agent Wells.

420 (1932); Henry v United States, 361 US 98, 4 L Ed 2d 134, 80 S Ct 168 (1959); Sibron v New York, 392 US 40, 20 L Ed 2d 917, 88 S Ct 1889 (1968)), nor can an apprehension or search be validated by what it uncovers. United States v Brown, 10 USCMA 482, 488, 28 CMR 48 (1959); United States v Penman, 16 USCMA 67, 36 CMR 223 (1966), and cases cited at page 76. In the case at bar, Agents Trejo and Wells were authorized to apprehend members of the armed forces. Paragraph 19, Manual for Courts-Martial, United States, 1969 (Revised edition). The question posed, therefore, is whether the apprehension of this accused was based upon a *reasonable belief that an offense has been committed and that the person apprehended committed it.*" (Emphasis supplied.) As this Court stated in United States v Ness, 13 USCMA 18, 22, 32 CMR 18 (1962):

". . . The crucial element in a search question is the existence of probable cause. Without probable cause an arrest without a warrant is invalid and necessarily a search conducted as an incident to the arrest is also invalid."

See also Henry v United States, supra.

The fact that the information received by agent Trejo, on which he acted, was hearsay does not, of itself, invalidate the apprehension. It is sufficient if he acts on the report of *a reliable informant which is supported by corroborating circumstances.* Jones v United States, 362 US 257, 4 L Ed 2d 697, 80 S Ct 725 (1960); Aguilar v Texas, 378 US 108, 12 L Ed 2d 723, 84 S Ct 1509 (1964); United States v Penman, supra.

All of the information relating to the possible misconduct of the accused and of Specialist Messer was supplied by a previously unknown individual who stated that he was a Sergeant and an intelligence agent. His source for the information was yet another unidentified third party described by him as a Vietnamese national who had allegedly supplied intelligence information to him in the past. No effort was made by the CID agents to ascertain whether in fact this information was valid and reliable. The identity of the parties and the connection of Major Weshenfelder with the distribution of ration and ID cards was not even known beforehand. The only corroboration, if it can be called that, was testified to by Agent Trejo:

"Just the fact that we checked out the location of the bar. It checked with the information we had received plus when we went in, we observed the Sergeant sitting where he said he would be there and the Major was there and he pointed out the Major."

Later the Specialist (Messer) came into the bar proper from a back room and spoke with the Major. Aside from the Sergeant and some bar girls, they were the only patrons in the bar.

Neither Trejo nor Wells observed any illegal or suspicious activity in the Copa Cabana Bar. The location is a neutral circumstance as the bar was not off-limits and it was not known as a place where illegal activity had previously occurred. No one suggested that the accused and Messer were searched because the apprehending officers feared for their personal safety. As Trejo testified, the apprehension was "[b]ased on the information we had received. . . . Since there were no other people in the room, we concluded that they were the people we were looking for."

In our opinion, the facts of this case fail to disclose the existence of probable cause for the apprehension and search of the accused. United States v Brown and Henry v United States, both supra. Since the evidence disclosed thereby was inadmissible in evidence, the arrest being illegal, the first certified question is answered in the negative.

II

The answer to the question of whether the search of the accused's

desk was legal need not detain us. The authority of a commanding officer to search a Government █ desk, used for official business, for Government property, is not a search of the effects of a subordinate, who is entitled to use the desk in the performance of his Government duties, and is not, therefore, subject to the subordinate's Fourth Amendment right of security against unreasonable search and seizure. United States v Collins, 349 F2d 863 (CA 2d Cir) (1965); People v Overton, 51 Misc 2d 140, 273 NYS2d 143, appealed, 20 NY2d 360, 229 NE2d 596, 283 NYS2d 22 (1967), remanded, 393 US 85, 21 L Ed 2d 218, 89 S Ct 252 (1968), rehearing denied, 393 US 992, 21 L Ed 2d 457, 89 S Ct 441 (1968), reaffirmed, 24 NY2d 522, 301 NYS2d 479, 249 NE2d 366 (1969); cf. United States v Blok, 188 F2d 1019, 1021 (CA DC Cir) (1951), discussed in United States v Garlich, 15 USCMA 362, 369, 35 CMR 334 (1965).

In this case, the accused was charged with the responsibility for issuing ration cards and ID cards within the command. Colonel Walsh, who authorized the search of the desk, was aware of this. It was within his authority to direct that an inspection of the accused's unlocked desk be made to determine whether the accused was maintaining these cards in a manner contrary to regulations pertaining thereto. The finding of the ration cards in the unlocked desk, contrary to paragraph 7, Military Assistance Command Vietnam Directive 60–7, dated March 31, 1968, resulted in the accused's conviction under specification 2, Charge II (Article 92, Code, supra, 10 USC § 892). Since the evidence disclosed by the search of the desk was admissible, the second certified question is answered in the affirmative.

That portion of the decision of the Court of Military Review affirming the accused's conviction of carrying a concealed weapon (specification 1, Charge III, Article 134, Code, supra, 10 USC § 934) is reversed. The record of trial is returned to the Judge Advocate General of the Army. The Court of Military Review may reassess the sentence on the basis of the remaining finding of guilty.

Chief Judge QUINN and Judge DARDEN concur.