UNITED STATES, Appellee

v

LEO E. POUNDSTONE, Private, U. S. Army, Appellant

22 USCMA 277, 46 CMR 277

No. 26,063

May 25, 1973

*Captain James K. Stewart* argued the cause for Appellant, Accused. With him on the brief were *Colonel Arnold I. Melnick, Captain Francis X. Gindhart,* and *Captain Denis E. Hynes.*

*Captain Ronald A. Cimino* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Ronald M. Holdaway, Major Thomas P. Burns, III, Captain Glenn R. Bonard,* and *Captain Richard L. Menson.*

## Opinion

QUINN, Judge:

Stopped and searched by a security guard when he attempted to enter Phu Loi Base Camp, Republic of Vietnam, through the main gate, the accused was found to be in possession of a quantity of heroin. In due course, he was brought to trial on a charge of wrongful possession of that substance, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. A timely defense objection to the admission of evidence of discovery of the heroin was overruled and the accused was convicted. The correctness of the trial judge's ruling is the subject of this appeal.

Lieutenant Colonel Brown was the commanding officer of 520th Transportation Battalion, which was stationed at the Phu Loi base camp. He was also the designated installation coordinator of the camp. Several other battalions were stationed at the camp. As installation coordinator, Colonel Brown had no command or administrative control over these units, but he was responsible for "common use" and "maintenance" of the camp "facilities," such as the post exchange, and for the camp's "security" and "perimeter defense." Apparently, personnel from each battalion were detailed to perform those functions.

Regular ingress and egress were only at the main gate of the camp. Security guards controlled vehicles and persons passing the gate. A large sign at the entrance and exit lanes advised that "all vehicles" and "all personnel" were subject to search. According to Specialist

Four Hughes, who served as a gate guard for about a month, the guards were "authorized" to search vehicles and persons. Hughes had been expressly instructed to that effect by the guard platoon sergeants. Hughes testified that he knew of U. S. Army Vietnam Regulation Number 190–20, which provides for identification and control of persons "entering installations and activities" of the command, but it reasonably appears he was not informed of the provisions of the regulation relating to his "job" until after he had made the search in issue. That search was not initiated by Hughes as a security guard but was undertaken on the direct order of a Warrant Officer Eadleman.

Eadleman was not a witness at the trial. He had returned to the United States and he could not be reached at the time of trial. His presence and authority at the gate were explained by Major Braush, executive officer of the 520th Transportation Battalion. Major Braush testified that the battalion was having great problems with "unsafe vehicles on the road," and the "volume of narcotics" in the "company areas." The battalion "knew that the narcotics were coming in on vehicles." As a partial solution to these problems, an officer of each of the six units within the battalion, all of which were located in the camp area but were not contiguous to each other, was detailed to the gate, "to assist" in the control of the unit's vehicles and personnel "in and out" of the camp. The gate was selected as the "control point" because it was "more convenient . . . than to run around to the various areas." Initially, Warrant Officer Eadleman was assigned to that duty for his unit, but at a battalion commander's conference, it was determined that he should act for the "entire battalion." Aware of the "safeguards [that] were there," Eadleman was instructed, in part, "to search every vehicles of the battalion" to control its safety and to counter the "flow" of contraband narcotics. He was also instructed that "when he searched a vehicle . . . he must search all of the individuals on the vehicle."

On the morning of March 25, 1971, a truck belonging to the 539th Transportation Company, a battalion unit, entered the main gate. Eadleman ordered Specialist Hughes to search it and "the people on" it. Hughes "pulled the vehicle over" to the side. The accused and a person named Torres "jumped" from the "back of the vehicle" and "walked" toward the camp interior. Hughes called them back and told them they were to be searched. First, he "lightly searched" them; he then directed that they remove the contents of their pockets and put them on the running board of the truck. One of the things removed by the accused from his pockets was a small package containing ten vials of heroin. The military police were called and the accused and the vials were turned over to them.

■ The accused contends that the search of his person was illegal because it was not justified by probable cause and he did not consent to it. In opposition, the Government argues that members of the armed forces have no protection against unreasonable search and seizure "in a war zone during a period of actual hostilities." Certainly, armed conflict and its effects may make reasonable Government action in a war zone that would be unreasonable within the peaceful geographical limits of the United States. See Dorr v United States, 195 US 138, 143 (1904); United States v Vierra, 14 USCMA 48, 33 CMR 260 (1963). That is not to say, however, there is no protection whatever against any kind of search and seizure. Our cases are to the contrary. We have consistently recognized the right to be free from unreasonable search and seizure, both in areas of tranquility within the borders of friendly nations and in areas of combat against an acknowledged enemy. See United States v Gibbins, 21 USCMA 556, 45 CMR 330 (1972); United States v Hendrix, 21 USCMA 412, 45 CMR 186 (1972); United States v Carter, 16 USCMA 277, 36 CMR 433 (1966); United States v Florence, 1 USCMA 620, 5 CMR 48 (1952).

■ In constitutional terms, the protection against Government intru-

**22 USCMA 279**

sion into the privacy of the individual guards against "unreasonable" search and seizure. The usual standards by which to determine the reasonableness of a search is whether it was based upon facts that would give a prudent person probable cause to believe that evidence connected with a crime is in possession of the person to be searched or at the place to be searched. United States v Alston, 20 USCMA 581, 44 CMR 11 (1971). Appellate defense counsel contend that neither Warrant Officer Eadleman nor Specialist Hughes had probable cause to believe that the accused had heroin in his possession. All the evidence supports their contention, but that is not determinative of the legality of this search. Probable cause to believe that a crime was committed or is in progress is not the universal standard for the reasonableness of government action affecting the privacy of the individual. A street encounter in which a police officer stops and frisks a person, in the interest of effective crime prevention, does not require probable cause; the test of the legality of the detention and search is "reasonableness." Terry v Ohio, 392 US 1 (1968). Whether denominated a search or an "administrative investigation," other types of examination of the person or his property, although not based upon probable cause, are not violative of the protection against unreasonable search. United States v Kazmierczak, 16 USCMA 594, 600, 37 CMR 214, 220 (1967). When such action is "a crucial part of the regulatory scheme" of a Government program and presents only a limited threat to the individual's "justifiable expectations of privacy," the Government may lawfully enter private property without probable cause. United States v Biswell, 406 US 311, 315–16 (1972); Wyman v James, 400 US 309 (1971). In every case of detention of person or property the standard of measurement of the Government's action is the "rule of reason." United States v Kazmierczak, supra. See also United States v Maglito, 20 USCMA 456, 43 CMR 296 (1971); Downing v Kunzig, 454 F2d 1230 (6th Cir 1972).

Citizens or aliens coming into the United States from a foreign country are subject to a search of their persons and effects by a customs agent on "suspicion alone, or even on a random basis." United States v Stornini, 443 F2d 833, 835 (1971), cert denied, 404 US 861 (1971). Government counsel perceive "a gate search" at a military installation as an appropriate parallel to the border search. We are referred to United States v Gaddis, 41 CMR 629 (ACMR 1969), petition denied, 19 USCMA 629 (1970) as authority. Such a search, say counsel, quoting from an opinion by the United States Attorney General, is a reasonable exercise of the commander's power to exclude all persons from a military base, or to admit them under such restrictions as "the public interest may demand." 26 Ops Atty Gen 91, 92, cited with approval in Cafeteria and Restaurant Workers Union Local 473 v McElroy, 367 US 886, 893 (1961). See also Flower v United States, 407 US 197 (1972). Unquestionably, the necessity to exclude contraband from the military installation parallels that in a border search, but how far the parallel can be extended is another matter. Many large installations encompass huge residential areas for the families of military personnel. Whether an installation commander can demand the right to search the person and effects of the family members as the price of admission through the gate is not at all fixed by authority or precedent. In the Cafeteria and Restaurant Workers Union case, the Supreme Court referred, with apparent approval, to an 1837 opinion by Attorney General Butler, 3 Ops Atty Gen 268, which upheld the right of the Superintendent of the Military Academy to remove civilian tenants at will occupying public buildings and which seemed to sanction submission to a search as a condition for their entry upon the Academy grounds. 367 US at 893. At the same time, however, the Court also cited an opinion by the Judge Advocate General of the Army which defined the commander's power over the gateway to "the authority conferred on him by statutes and regulations." JAGA,

1904/16272, 6 May 1904. Additionally, the Judge Advocate's opinion speaks of exclusion of persons "other than those belonging to" the post. The materials presented to us do not indicate whether the right of exclusion extends to military persons. Military personnel assigned to a unit on a particular base are bound by their orders to be present at that base. In his dissent in United States v Brown, 10 USCMA 482, 493, 28 CMR 48, 59 (1959), Judge Latimer considered the relationship between the right to enter and the right to demand submission to a search as the price of entry in regard to military personnel posted to the base. He implied that such persons cannot be excluded, but he perceived this circumstance as making a search at the entrance "the only effective way to reach the evil" of smuggling contraband into the installation. He concluded that a gateway search of the person was "reasonable"; but still he acknowledged that the commander did not have "unlimited power to search," and consequently, the validity of a gateway search instituted by him depended upon whether he had "reasonable cause to order" it. Id. at 492–93, 28 CMR at 58–59. In United States v Gebhart, 10 USCMA 606, 28 CMR 172 n 2 (1959), the Court drew attention to the right of a commander to inspect military persons "entering or leaving certain areas." The word "certain" implies that the right of inspection may be qualified. Arguably, the suggested parallel between a border search and a search at the gateway to a military installation may end at the point of assumed consent to the search as the alternative to lawful exclusion from the area. We are not inclined, therefore, to accept the Government's invitation to define the scope of a gateway search in terms of a border search, especially since the perimeters of the border search may be undergoing realignment. See Note, Border Searches and the Fourth Amendment, 77 Yale LJ 1007 (1968).

At the outset, we are confronted by appellate defense counsel's attack on the source and scope of Colonel Brown's authority to make any search at the camp gate. At trial, notice was taken of two regulations, Army Regulation 210–10 and U. S. Army Vietnam Regulation Number 190–20, March 11, 1969, both of which deal with control of persons entering and leaving military installations. Counsel contend that Colonel Brown's position as installation coordinator did not invest him with the authority of a post commander within the meaning of either regulation. Further, they construe the Vietnam command regulation as applicable only to control of civilian employees. Also, they contend that the search of the accused was not made on Colonel Brown's authority as installation commander but under his direction as battalion commander. In my view of the issue, these contentions need not be explored. The evidence indicates, and the accused concedes, that Colonel Brown had "command control . . . over the vehicles of his battalion."

United States v Doyle, 1 USCMA 545, 4 CMR 137 (1952), commented on the long-established rule that, inherent in his responsibility for control of the military property of his organization, the military commander has power to search Government property. The Court went on to hold that the power to search may be delegated. On the basis of the evidence, Warrant Officer Eadleman had authority to search battalion vehicles, either because he was acting in execution of Colonel Brown's decision to conduct such search or because he had been delegated the authority by Colonel Brown and could independently decide when to search and what vehicles to search. Regardless of the presence or absence of probable cause, there were good and sufficient reasons, in my opinion, to inspect each battalion vehicle for safety and to search it for contraband. Eadleman's order to Hughes that the vehicle be stopped and searched was therefore legal, and Hughes' execution of the order was also legal. See United States v Weshenfelder, 20 USCMA 416, 43 CMR 256 (1971); United States v Lange, 15 USCMA 486, 35 CMR 458 (1965). As to the vehicle, the intrusion was into the Govern-

ment's own property, not into the private property of the individual, and it was, therefore, entirely legal. What then is the legality of the search of the accused's person?

*Doyle* recognized that when a search of military property affects the "rights of an individual" in connection with a criminal prosecution, exercise of the power to search may be subject to "limitations." 1 USCMA at page 548, 4 CMR at page 140. We identified one limitation in United States v Mossbauer, 20 USCMA 584, 44 CMR 14 (1971), which held while taking control of the private possessions of an absentee for the purpose of inventory and safekeeping was lawful, that procedure could not be used as a subterfuge for a search for evidence of a crime. See also United States v Santo, 20 USCMA 294, 43 CMR 134 (1971).

Appellate defense counsel contend that no "reason for ordering" that the accused be searched appears in the record. As I read the record, it convincingly indicates that the search was ordered only because the accused was in the truck when it was stopped. True, the actual search was conducted by a security guard at the main gate of the camp, but Major Braush's testimony leaves no doubt that selection of site and personnel for conduct of the search was solely for "convenience." It is also clear from the major's testimony that Colonel Brown's instructions to Eadleman were that he "must" search all passengers in a vehicle that he selected for search.

■ In United States v Di Re, 332 US 581, 587 (1948), the United States Supreme Court commented, with approval, on a concession by the Government that it could not, when "armed with a search warrant for residence only . . . search all persons found in it." The Court went on to hold that mere presence of an individual as a passenger in a vehicle lawfully subject to search did not deprive him of "immunities from search of his person to which he would otherwise be entitled." However, that case dealt with a passenger in a private automobile; here, we

are concerned with a passenger in a Government vehicle, which there was good reason to believe was the means of introducing contraband narcotics into the command. In my opinion, persons in a military vehicle which is suspected of being used to import forbidden matter into the command area may be searched as an incident to search of the vehicle, especially if they are not, as appellate defense counsel concedes the accused was not, a member of the command. I conclude, therefore, that the search was legal and that the results of the search were properly admitted into evidence against the accused.

For the reasons set out in his separate opinion, Chief Judge Darden is also of the opinion that the search of the accused was lawful and the evidence properly admitted. Accordingly, the decision of the Court of Military Review is affirmed.

DARDEN, Chief Judge (concurring):

In my opinion, the commanding officer of a military installation or, as here, his alter ego may without probable cause order the search of military personnel or vehicles entering or leaving his base as a necessary part of his authority and responsibility for the security of his command.

This Court has long recognized "the commanding officer's traditional authority to conduct a search in order to safeguard the security of his command." United States v Brown, 10 USCMA 482, 489, 28 CMR 48, 55 (1959). The Court has also commented that:

Both the generalized and particularized types of searches are not to be confused with inspections of military personnel entering or leaving certain areas, or those, for example, conducted by a commander in furtherance of the security of his command. These are wholly administrative or preventive in nature and are within the commander's inherent powers.

United States v Gebhart, 10 USCMA 606, 610 n 2, 28 CMR 172, 176 (1959). See also United States v Lange, 15 USCMA 486, 35 CMR 458 (1965); and

United States v Gaddis, 41 CMR 629 (ACMR 1969).

The Supreme Court has also recognized the extensive authority and responsibility of a military commander for the security of a military installation. In Cafeteria and Restaurant Workers Union v McElroy, 367 US 886, 892 (1961), the Court, in upholding the summary exclusion of a civilian employee from a Navy base in accordance with Navy regulations, pointed out that the regulations were but "the verbalization of the unquestioned authority which commanding officers of military installations have exercised throughout our history." In refusing to recognize any private or public right to be employed on the base, it declared that, in its "proprietary military capacity, the Federal Government . . . has traditionally exercised unfettered control." Id. at 896.[1] The traditional need for control over the security of these installations has also been expressly stated to be sufficient to sustain the exercise of military jurisdiction over armed forces personnel for offenses that would not otherwise be service connected. Relford v Commandant, 401 US 355, 367 (1971). Significantly, that consideration was considered sufficient to overcome Relford's claimed constitutional rights to indictment by grand jury and trial by jury for a civilian-type crime. See also O'Callahan v Parker, 395 US 258 (1969).

The conclusion to be drawn from these authorities, both in this Court and the Supreme Court, is that the commanding officer's traditional authority and responsibility for the security of a military base and its personnel are sufficiently broad to permit him constitutionally to search all those who enter or leave the installation's perimeters. While it is true that this Court has many times stated that the Bill of Rights is applicable to members of the armed forces, United States v Tempia, 16 USCMA 629, 37 CMR 249 (1967), that application is tempered by the demands of military necessity. United States v Priest, 21 USCMA 564, 45 CMR 338 (1972). Here, military considerations, particularly in a combat zone, demand that a commander have the authority to protect his base and personnel by the exclusion of contraband. The measures that this commander adopted seem eminently reasonable and, in the military context, no more is required to meet the test of the Constitution. United States v Kazmierczak, 16 USCMA 594, 37 CMR 214 (1967).

I join with Judge Quinn in affirming the decision of the United States Army Court of Military Review.

DUNCAN, Judge (dissenting):

In consideration of the arguments and briefs of the parties, I am convinced that at trial the case was adjudicated on the issue of whether the authority for the search is present in the four corners of paragraph 8a, USARV Regulation 190–20, March 11, 1969, which is as follows:

SECTION III—CERTAIN US CIVILIANS, LOCAL NATIONALS AND THIRD COUNTRY NATIONALS

8. POLICY: a. All personnel, including US and FWMAF and civilians, entering or exiting a US installation are subject to search. Those who object to a search will be denied access to the installation.

According to the plain meaning of the paragraph, Private Poundstone's *consent* was a necessary prerequisite to the search of his person, and in the absence of consent access to the installation was to be denied.[1] The

---

[1] If the base was wholly open to the public, a different result might obtain, but that is not the case here. Flower v United States, 407 US 197 (1972).

[1] In my opinion, this application of the regulation to servicemen obligated to be upon the installation is highly questionable, since its application obviously results in forcing him either to consent to the search of his person or face an absence charge. The regulation more reasonably seems directed to persons not having a service obligation to be upon the installation.

Government's evidence simply does not show that the appellant consented to the search. Consent to search cannot be inferred from his mere presence on the installation.[2] If the Government relies upon the regulation for the non-applicability of the requirement of probable cause to search appellant's person, as I believe they do, then, as a matter of law the requirements of the regulation have not been met.

The opinions of the other members of the Court appear either to give no substance to the consent requirement or to consider the regulation a lawful order for an administrative inspection.[3] Since I am unable to read the regulation in such a fashion, I could rest my conclusion upon the failure of the Government to prove Poundstone's consent to search. However, it is now necessary that I discuss the theories relied upon by the Government and expressions of my brothers.

In the absence of any hint of probable cause supportive of the search of Poundstone, can the narcotics be properly admitted into evidence as the fruits of an administrative inspection? Probable cause need not be established if the seizure was accomplished during the course of a bona fide administrative inspection. Paragraph 152, Manual for Courts-Martial, United States, 1969 (Revised edition). See United States v Lange, 15 USCMA 486, 35 CMR 458 (1965). However, the inspection label cannot disguise a true search not founded upon probable cause. United States v Grace, 19 USCMA 409, 42 CMR 11 (1970).

In order to reach the heart of the question, I must assume, without deciding, (1) that the regulation was applicable to servicemen rather than only civilian employees; (2) that the regulation was properly implemented by the local commander; (3) that the chain of authority was properly delegated to the person who searched the appellant; and (4) that it is somehow applicable in the absence of a showing of the appellant's consent to search.

The admixture of the terms inspection and search in common parlance is real; however, in this Court's cases the separation has been made. Searches are constitutionally protected, and a proper inspection is an excepted intrusion into privacy based upon certain military concerns that have been viewed as superior. In order to identify the nature of an inspection, the cases which follow are instructive.

In United States v Gebhart, 10 USCMA 606, 609, 28 CMR 172, 175 (1959), an officer directed "everyone to stand by his bunk; and then conducted an 'inspection' of their effects by checking the wall and foot lockers and under the mattress of each man." An investigating party thoroughly searched the entire barracks and those there billeted in United States v Harman, 12 USCMA 180, 30 CMR 180 (1961). In United States v Swanson, 3 USCMA 671, 14 CMR 89 (1954), the first sergeant called a formation of the company and an inspection of the men following a theft in the unit's bivouac area.[4] A search of the entire barracks was made in United States v Drew, 15 USCMA 449, 35 CMR 421 (1965). Involved in United States v Grace, supra, was a barracks inspection to check living conditions. Evidence incriminating an accused discovered during an inventory of his clothing and property as a safeguard while he was confined was held admissible in United States v Kazmierczak, 16 USCMA 594, 37 CMR

[2] "[A] peaceful submission to the officers of the law, that is to say, an acquiescence in the search, is not consent." United States v Heck, 6 CMR 223, 229 (ABR 1952), cited with approval in United States v Brown, 10 USCMA 482, 488 28 CMR 48, 54 (1959).

[3] In United States v Gaddis, 41 CMR 629 (ACMR 1969), the Court of Review held a gate search to be an inspectional search. The trial judge in the case at bar relied on that case in ruling the drugs admissible in evidence. Moreover, the court in *Gaddis* mentioned that the security of the post was at stake.

[4] Such an inspection was held to be lawful because the sole object of the quest was to locate stolen property.

214 (1967), but not admissible when the inventory was used as a pretext for searching, United States v Mossbauer, 20 USCMA 584, 44 CMR 14 (1971). Likewise, marihuana and a switchblade knife were found in the course of a good faith police inventory in the case of United States v Welch, 19 USCMA 134, 41 CMR 134 (1969).

The above cited inspection theory cases were held to be closely connected to the concept of the security, welfare or health of a number of persons as they then comprised a unit. The professed concern was the current status of unit, personnel and equipment, rather than criminal activity of any particular individual. Far different and far more remote is the nexus between the search of Private Poundstone and the fitness of his unit. Looking to the prior case law of the Court and the circumstance of the case before us, I deem the search herein to have transcended the limited area where Fourth Amendment rights have been or should be thrown off for the reason of a superior proven military need.

The Court decided in United States v Maglito, 20 USCMA 456, 43 CMR 296 (1971), that Maglito, who was housed in a barracks with others, under a form of restraint, had no reasonable expectation of privacy from a search of a package he had when he was about to enter the barracks. The Court relied on the special circumstance which existed, the fact that Maglito was a person under restraint, and determined him to have no reasonable expectation of privacy in his package. The result reached by the majority in the case we now review manifests no such concern for the need of *proof* of a special circumstance.

Assuming the continuity of the delegation of authority to search the appellant, yet another ill surfaces. The search procedure deposited limitless discretion to the searcher as to those persons who would be searched. Such a procedure adds to the chronic constitutional shortcoming the acute possibility that the persons made subjects of the search are determined by nothing more than the personal likes or dislikes of the delegate of the authority to search. I view neither all random inspections nor all personal motivation of officials as evils; however, under the facts of the case at bar the concepts combine to produce a resultant infringement on personal rights that I find repugnant.

Both of the other members of the Court have cited the case United States v Brown, 10 USCMA 482, 28 CMR 48 (1959). In *Brown* the question was "simply one of whether there was probable cause to search." Id. at 487, 28 CMR at 53. Brown and nine other soldiers were transported to a community center on an Army truck. Some of the men had been suspected of using narcotics. The commanding officer had received information that one of the men had borrowed $10.00. Acting upon his suspicion the officer arranged for a search of all ten of the men when they returned on the truck. Brown was found in possession of heroin. At 489, 28 CMR at 55, the majority opinion states:

> While we recognize the commanding officer's traditional authority to conduct a search in order to safeguard the security of his command, that issue is not presented here.

The *Brown* case simply was not adjudicated on the issue of whether or not there was an inspection without the protection of the Fourth Amendment. I am unable to agree with the position that even the dicta in *Brown* suggests that the probable cause to search requirement is extinguished by the mere recitation by a commanding officer that what is really occurring is an inspection designed to foster security without any evidence as to the nature of the security hazard. In *Brown*, the *dissenting* judge, objecting to the result reached by the plurality, set forth his view that the search was reasonable on a "protective theory alone." He stated at 493, 28 CMR at 59:

> It is to be remembered that an officer in command of a military area in a combat zone on foreign soil has more reason to order searches of the

individuals coming in and going from the area than would an officer stationed in the United States. In the case at bar, the unit was stationed in South Korea, and the illegal flow of narcotic drugs from North Korea and Communist China into the general area and eventually into the hands of American troops was a scourge with which commanders in that country had to deal.

Judge Latimer's well-stated views were rejected by the majority of the Court. Moreover, I discover no reasoning in *Brown* that leads to the conclusion that a contrary result would have been reached if the search had been conducted at the gate of the installation. Again, I repeat my belief that here, just as in *Brown*, we are confronted with a search, not an inspection.

Judge Quinn points out that "here, we are concerned with a passenger in a Government vehicle, which there was good reason to believe was the means of introducing contraband narcotics into the command." My view of the record does not reveal the facts adduced which amount to "good reason." Moreover, if the vehicle is suspected, can this mean that all passengers likewise are suspected of carrying contraband? The Court's decision in *Brown* held unlawful a search of suspected persons who were riding in a military vehicle because of a lack of probable cause. Some facts of suspicion in *Brown* (found to be woefully short of probable cause) were present; here there are none. Moreover, here we have only an allegedly suspect vehicle; in *Brown* we had suspected persons. The Government's position in *Brown*, which was rejected, is more persuasive than its contention herein.

I am aware of and sensitive to the fact that a search of persons at a gate is an advantageous spot to intercept contraband. However, if the "inspection theory" is the lone strong hand that pulls off the cover of the Fourth Amendment at the gate, consistency of theory would not allow a serviceman reasonable expectation of privacy from inspection anywhere upon the in-

stallation, all upon an order from the proper official and without any *proof* of a military exigency for the action. The appellee's brief suggests that the fact that the incident, *sub judice*, occurred in a war zone provides basis for the absence of Fourth Amendment protection. In general there has been no abandonment by the makers of our laws or this Court of the Fourth Amendment because of the conditions of conflict in Vietnam. Again, if the war zone contention is to be considered, the extent of the exigencies of it must be factually demonstrated.

It is apparent that the horror of drug use and its denigrating effect upon service personnel, in probability, can be lessened by a personal gate search of all or some of those who enter a base installation. The Court's decision cannot be rationalized by merely concluding that there is a "drug problem" among servicemen at a military installation. Admittedly, prior cases determined by this Court inform us of the horrible drug problem in Vietnam as well as many other parts of the world, including the United States. But from this record it cannot be concluded that the problem has created such a detrimental effect that Fourth Amendment rights can be so removed.

All who know our system of constitutional government must recognize and appreciate that the protection of the Fourth Amendment often impedes the efficiency of the process of discovery, adjudication, and punishment of crime. Yet, its value as a pillar of the structure of citizenship remains standing firmly in place. Holding "spot checks" of motor vehicles an unconstitutional invasion of private rights, the Supreme Court of Pennsylvania, in Commonwealth v Swanger, — Pa —, 300 A2d 66, 69 (1973), stated:

Admittedly, routine police "spot checks" of vehicles on the highway undoubtedly lead to the discovery of some unlicensed drivers and some unsafe or stolen vehicles. No doubt it might be argued that the possibility of such "spot checks" may

have a deterrent effect on many motorists who might otherwise flout the regulations pertaining to motor vehicles if they believed that the strong possibility existed that their violations would not be detected. However, by the same logic, the Commonwealth might argue for the reasonableness of permitting law enforcement officials to stop anyone they wished who was walking on the streets in a high-crime neighborhood, since such "stops" might lead to the discovery of crimes or have a deterrent effect on people who might otherwise commit crimes. Similarly, the same logic would permit officials to stop every vehicle near the state borders because of the effects such stops might have on the illegal transportation of liquor or cigarettes.

In Terry v Ohio [392 US 1 (1968)], the United States Supreme Court explicitly rejected this logic.

Paragraph 1–15(1), AR 210–10, Installations-Administration, December 1, 1970, provides in part:

[An] installation commander may direct authorized guard personnel, while in the performance of assigned duty, to search the persons and possessions, including vehicles, or any persons . . . upon their entering . . . facilities over which the Army has responsibility. Such searches are authorized when based upon probable cause that an offense has been committed or upon military necessity. Instructions of commanders regarding such searches should be specific and complete. Guards should be instructed that incoming persons should not be searched over their objection.

AR 210–10 provides conditions for a gate search that are not required by USARV Regulation 190–20. We are not confronted with the constitutionality of AR 210–10, and I set it forth only to evidence the Army's general concern about and recognition of the gate search problem.

Since there is no evidence before us tending to prove military necessity and the Government takes the position that its authority for the gate search is complete in USARV Regulation 190–20, there is no need to decide whether AR 210–10 (requiring proof of probable cause or military necessity for a gate search) is compatible with the Fourth Amendment.[5] However, I agree with the appellant's thought that neither military necessity nor probable cause is shown merely because of appellant's assignment in Vietnam.

The appellant argues:

[I]n the absence of some narrow valid definition of true emergency circumstances, a search conducted under the grant of authority in AR 210–10, based solely upon the existence of a "military necessity" rather than upon consent or upon a showing of probable cause, is a general exploratory search contrary to the Fourth Amendment.

Leaving for now the problems associated with defining and applying the concept of military necessity, I do believe, however that in order to decide this case, a sort of balancing test must be utilized. In order to determine whether the protection of the Fourth Amendment is to be continued, the Government has the heavy burden to put upon the scales proof by facts and proper inferences in order that we might weigh these facts against the continued applicability of the Fourth Amendment. This the Government has failed to do. Therefore, I respectfully dissent.

---

[5] Appellant contends for a rule which would allow the commander to authorize the gate search if he has probable cause to believe that the physical security of his installation is in jeopardy, rather than a mere showing of military necessity.