## UNITED STATES

### v.

**Private (E–1) Leroy DAVIS, 400–88–6177, US Army, Headquarters Company, Fort Richardson, APO Seattle 98749.**

### SPCM 11799.

U. S. Army Court of Military Review.

7 Oct. 1976.

---

Appellate Counsel for the Accused: CPT Richard A. Pearson, JAGC; CPT Sammy S. Knight, JAGC; MAJ Richard J. Goddard, JAGC; COL Alton H. Harvey, JAGC.

Appellate Counsel for the United States: CPT Conrad J. Rybicki, JAGC; MAJ Steven M. Werner, JAGC; MAJ John T. Sherwood, Jr., JAGC; LTC Donald W. Hansen, JAGC.

## OPINION OF THE COURT

O'DONNELL, Judge:

The appellant was convicted despite his pleas, by military judge sitting alone, of possessing, and possessing with intent to distribute, tetrahydrocannabinol (THC) in violation of Articles 92 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892 and 934. The approved sentence includes a bad-conduct discharge, confinement at hard labor for five months, and forfeiture of $240.00 pay per month for six months.

Counsel for the appellant attacks the legality of the procedures pursuant to which the contraband was seized from the appellant as well as alleged infirmities in the laboratory analysis of the substance seized.

I

## SEARCH AND SEIZURE

At trial the appellant moved to suppress the evidence that he possessed packets containing THC on the ground that they had been seized during an illegal search of his person. While not expressed at the outset, it became clear from the trial defense counsel's arguments that the entire thrust of his constitutional attack was that the company commander who ordered the search lacked probable cause to do so under the rules announced in *Aguilar v. Texas*,

378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and its progeny.

The testimony adduced during litigation of this issue reveals that the appellant had been summoned to his commander's office for counseling concerning positive results from a urinalysis that he had recently undergone. The commander, Major Robert E. Fitchett, was out when the appellant arrived. Upon his return, the major was told by his legal clerk, Specialist Six Tae K. Sture, that an informant had just seen the appellant offer to sell what appeared to be drugs to another soldier. As Major Fitchett had to leave immediately for a meeting with his superior, he did not elicit further details from Specialist Sture at this time. Instead, he told Sture to keep the appellant, who was still waiting for his counseling session, under observation and out of contact with any other persons pending his return. Sture complied with this directive and denied several of the appellant's requests to leave, stating that the commander would be coming back shortly to see him.

In the interim, Specialist Sture again contacted the informant and obtained additional details surrounding the incident. When he returned from his meeting, Major Fitchett again spoke with Sture who supplied the additional facts, to include exactly what the informant had seen transpire when the appellant had attempted to sell "angel dust" to a third party. Sture also told the major that the informant had never lied to him and had given him reliable information of this type in the past.

Major Fitchett testified that he coupled this direct information with what he personally knew about the appellant and the informant, who was his assistant legal clerk, and concluded that there was "no doubt" that he had probable cause to search the appellant. The appellant was then directed to empty his pockets, whereupon the foil packets containing the suspected illicit substance were seized.

It was the appellant's position below that the company commander did not have probable cause to search him even after receiving the additional information from Specialist Sture. It is clear to us that the military judge correctly denied the appellant's suppression motion on this basis. Even without the background information from his own personal knowledge of the individuals involved, Major Fitchett was supplied with ample information by Specialist Sture to make a valid determination concerning the informant's basis of knowledge and reliability to meet the *Aguilar* requirements. *See* paragraph 152, Manual for Courts-Martial, United States, 1969 (Revised edition).

■ While not conceding the existence of probable cause immediately before the search, the appellant's major contention before this Court is that the incriminating evidence should have been excluded because it was obtained as the result of an apprehension not based on probable cause.[1] Following this theory to its conclusion, appellate defense counsel assert that the subsequent search was tainted through the exploitation of this alleged unconstitutional deprivation of liberty, notwithstanding a possible later existence of probable cause to search.

We agree that at the time the appellant was first detained by order of Major Fitchett there was no probable cause to apprehend because the commander's information had been received from an informer whose reliability had not yet been determined as required by *Aguilar*. It does not necessarily follow, however, that the appellant's detention was illegal. The Supreme Court has permitted limited restrictions on personal liberty not amounting to formal arrests. Thus, in *Terry v. Ohio,* 392 U.S. 1, 88

---

1. An apprehension to be lawful must be effected by one who has a "reasonable belief that an offense has been committed and that the person apprehended committed it." Article 7(b), Code, *supra.* The term "reasonable belief" is synonymous with the more common term "probable cause." *See United States v. Wesh-*

*enfelder,* 20 U.S.C.M.A. 416, 43 C.M.R. 256 (1971); *United States v. Morales,* 49 C.M.R. 458 (A.C.M.R.1974), *reversed on other grounds,* 23 U.S.C.M.A. 508, 50 C.M.R. 647, 1 M.J. 87 (1975). *See also Draper v. United States,* 358 U.S. 307, 310 n. 3, 79 S.Ct. 329, 3 L.Ed. 2d 327 (1959).

S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Court held that a policeman may under certain circumstances lawfully stop a person and subject him to a limited search for weapons, notwithstanding an absence of probable cause to arrest. Such detentions are considered to be a seizure of the person within the meaning and protection of the Fourth Amendment.[2] The validity of such a seizure and the subsequent search for weapons is to be governed not by the standard of probable cause but by the reasonableness of the policeman's action in light of the particular circumstances.

As Chief Justice Warren stated:

"If this case involved police conduct subject to the Warrant Clause of the Fourth Amendment, we would have to ascertain whether 'probable cause' existed to justify the search and seizure which took place. However, that is not the case. . . . Instead, the conduct involved in this case must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." *Id.* 392 U.S. at 20, 88 S.Ct. at 1879.

In view of these precedents, we may properly examine the actions of Major Fitchett to determine if the appellant's detention was a reasonable intrusion on his liberty. We note at the outset that the detention in this case differs from that in *Terry.* That case, of course, involved only a stop, while the instant case concerns a detention of approximately one hour. Moreover, in *Terry* the stop was effected to investigate suspicious behavior on the part of the accused with an incidental pat down for weapons. Here, the detention was imposed to determine whether there was probable cause to search for evidence of criminal conduct. These factors, while not insignificant, represent only differences of degree. We are convinced that the rule of reason announced in *Terry* is not to be restricted to the limited facts of that case but may justify more extensive detentions

for more complete investigations. The test is whether the particular intrusion upon the accused's liberty is reasonable under the facts and circumstances of the particular case.

In *Davis v. Mississippi,* 394 U.S. 721, 727–28, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), the Supreme Court indicated that a detention at the police station for the purpose of taking fingerprints might under narrowly prescribed circumstances pass constitutional muster even if there is no probable cause to arrest. Going even further, two jurisdictions have upheld the authority of a court to issue an order directing a suspect to participate in a lineup, notwithstanding a lack of probable cause to arrest. *Wise v. Murphy,* 275 A.2d 205 (D.C.App.1971); *Merola v. Fico,* 81 Misc.2d 206, 365 N.Y.S.2d 743 (1975). *But see People v. Marshall,* 69 Mich.App. 288, 244 N.W.2d 451 (1976).

In testing for reasonableness, we may consider several factors, to include the nature of the offense of which suspected, the quantity and quality of the information available, the nature and duration of the detention and the motive of the person effecting the detention. The suspected offenses in the instant case were possession and attempted transfer of narcotics, certainly serious offenses, particularly in a military environment. Major Fitchett had reason to believe that the appellant was a drug user, having been previously informed of a positive urinalysis. He also had received information from his legal clerk—albeit not amounting to probable cause—that the appellant was then in possession of drugs and was attempting to transfer them. The detention imposed was for a relatively brief period of time while Major Fitchett attended a commander's call. The nature of the detention was no more rigorous than necessary to insure the appellant's presence pending the return of the company commander. Finally, it is particularly significant that Major Fitchett directed the deten-

---

**2.** As the Supreme Court stated in a similar situation, "the detention of the respondent against his will constituted a seizure of his person, and the Fourth Amendment guarantee of freedom from 'unreasonable searches and seizures' is clearly implicated." *Cupp v. Murphy,* 412 U.S. 291, 294, 93 S.Ct. 2000, 2003, 36 L.Ed.2d 900 (1973).

tion so that he could determine whether he had probable cause under calmer conditions when more time was available. Under the circumstances, Major Fitchett's actions were reasonable and therefore the detention of the appellant was lawful.

This is not the end of the matter, however. We must next determine whether the subsequent search of the appellant was lawful. *Terry* authorized only a limited search for weapons and did not purport to authorize a full search for evidence following the temporary stop.[3] In the instant case, however, we are not faced with that problem because when Major Fitchett searched the appellant he had probable cause. At that time the reliability of the informant had been verified as required by *Aguilar*. The search therefore was lawful and the evidence admissible.

Even were we to conclude that the appellant's detention was unlawful, our holding remains unchanged. It is true, of course, that the exclusionary rule applies to evidence derived from an exploitation of an unlawful act on the part of law enforcement officials. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Moore,* 19 U.S.C. M.A. 586, 42 C.M.R. 188 (1970); *United States v. Taylor,* 2 M.J. 863 (30 April 1976), *pet. denied* (8 September 1976). However, not every illegal police activity results in the inadmissibility of subsequently uncovered materials. *Wong Sun v. United States; United States v. Taylor,* both *supra.*

In this case the drugs seized from the appellant were simply not the fruit of the earlier detention. The detention itself provided no additional information for the commander to use in making his probable cause determination. Unlike the accused in *Wong Sun,* the appellant made no incriminating statements as a result of the restriction of his movements. *See also Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Thus, his detention had "no evidentiary consequences" which could have infected the search which was based on totally independent facts. *Wong Sun v. United States, supra* at 491, 83 S.Ct. 407.[4]

The appellant suggests that his continued presence was exploited by the successful search. We find no basis for a holding of an impermissible taint on this ground alone. The appellant had no right to be accorded the opportunity to dump the contraband. The Supreme Court has explicitly rejected the use of such "but for" tests in this area, stating instead that the facts of each case must control. *Brown v. Illinois, supra,* 422 U.S. at 603, 95 S.Ct. 2254. Under the circumstances here, including the absence of any bad faith on the part of the commander involved, we conclude that the prosecution met its burden of establishing admissibility through the lack of taint. *Id.* at 604, 95 S.Ct. 2254.

## II

## HEARSAY

The appellant's second assertion raises an evidentiary issue which has been alluded to but never addressed in depth by the military appellate courts. *See, e. g., United States v. Maher,* 46 C.M.R. 535, 537 (N.C.M.R.1972). In essence the appellant attacks the sufficiency of the evidence of guilt, arguing that the procedures used at the U.S. Army Crime Laboratory at Fort Gordon, Georgia, to identify the alleged contraband seized from him were fatally flawed in that the laboratory technician

---

3. Even the cases cited previously extending *Terry* (*Davis, Wise* and *Merola* ) do not purport to authorize a full criminal search following a detention without probable cause.

4. An illegal detention could in some circumstances have "evidentiary consequences" and taint a subsequent probable cause search. For example, had the appellant been detained for a protracted period of time solely to permit the authorities to obtain probable cause, the resulting search would undoubtedly be bad even though based on the after-acquired probable cause.

relied on hearsay information in performing one of the two tests which produced positive results.

The military judge admitted a laboratory report indicating that the packets seized from the appellant contained THC, after hearing the testimony of the technician who analyzed the substance and prepared the report. This prosecution witness, Specialist Four John Reddick, first testified concerning his education and experience, whereupon the trial defense counsel indicated that he did not contest his qualifications as an expert.[5] It is clear from Specialist Reddick's testimony that when he began work on the substance taken from the appellant, he was under the impression that the packets contained hashish and, therefore, he performed tests designed to confirm this initial conclusion. However, three visual and microscopic analyses negated this possibility, as they affirmatively established that the specimen contained neither marijuana nor hashish.

Specialist Reddick then testified that he performed two additional tests to determine whether THC, the active ingredient of hashish and marijuana, was present. One of these experiments, referred to as "thin layer chromatography," consists of a sophisticated comparison of a sample of a "known" substance with the suspected contraband being tested. Unlike the first three visual tests that were performed, this analysis produced positive results. However, on cross-examination the witness admitted that he did not personally test the "known" substance to verify the presence of THC. Instead, he used control samples

which had been obtained from a Department of the Army agency. These samples are analyzed by graduate chemists, apparently at the Army Crime Laboratory, and maintained for later laboratory testing requiring the use of known substances. Thus, as the appellant correctly contends, Specialist Reddick relied on hearsay in the form of identification of the known substance, which secondary information was essential to the performance of the experiment.

In military practice, an expert witness may rely on the data and reports of others in arriving at his opinion as to a particular point in issue. Paragraph 138e, Manual for Courts-Martial, United States, 1969 (Revised edition); *United States v. Walker,* 12 U.S.C.M.A. 658, 31 C.M.R. 244 (1962); *United States v. Heilman,* 12 U.S.C.M.A. 648, 31 C.M.R. 234 (1962). Use of such underlying data does not affect the admissibility of the opinion testimony of the witness, but may affect the weight to be accorded that testimony.[6]

Although the Manual for Courts-Martial does not specifically authorize the use of hearsay in the formation of opinion testimony, it is clear that the reports of others which the Manual permits the witness to rely on would, in most cases, constitute hearsay. Reliance on such hearsay as to secondary data is, we believe, acceptable so long as the ultimate opinion is that of the witness himself and, as with any exception to the hearsay rule, so long as the secondary data relied on by the expert is trustworthy, or, in the words of the Manual, "of a kind customarily considered in the practice of the expert's specialty." Paragraph 138e,

---

**5.** Specialist Reddick is not a graduate chemist but only a "marijuana examiner." He has, however, received training in chemistry at the Army Chemical School.

**6.** Paragraph 138e of the Manual provides:
"If in the course of [explaining his opinion the expert witness] refers to matters which, if themselves regarded as evidence in the case would be inadmissible and might improperly influence the members of the court, . . . the military judge . . . should instruct the members of the court in open

session that these matters are to be considered only with respect to the weight to be given to the expert opinion."
The newly adopted Federal Rules of Evidence are more explicit in this regard:
"If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject the [underlying] facts or data need not be admissible in evidence." Rule 703, Federal Rules of Evidence.

Manual, *supra.* *See generally,* Maguire and Hahesy, Requisite Proof of Basis for Expert Opinion, 5 Vanderbilt Law Review 432 (1952). *See also United States v. Aluminum Company of America,* 35 F.Supp. 820 (S.D.N.Y.1940). We are satisfied that the testimony in the instant case meets this qualification.

The reliance here upon the identification of the sample THC by the Department of the Army chemists is similar to the routine acceptance of hearsay in many other forms in the laboratory. Most commercially prepared chemicals and solutions used in laboratory analysis are labeled by persons employed elsewhere. Thus, the label is pure hearsay as to the contents of the bottle to all others who use it. If we were to require proof of every compound so used, it would become virtually impossible to introduce the results of laboratory testing in a criminal case. Such a result would be contrary to common knowledge and common sense in a case such as this where no evidence of record casts suspicion on the experiments performed.

Accordingly, we are satisfied under the limited factual situation before us that the military judge properly permitted Specialist Reddick to testify as to the results of the "thin layer chromatography" test. By way of caveat, however, we would note that in other situations the requisite reliability might not be present to justify a like result. *See, e. g., United States v. Spencer,* 21 C.M.R. 504, 519 (A.B.R.1956); *cf. United States v. Evans,* 21 U.S.C.M.A. 579, 45 C.M.R. 353 (1972).

Considering the entire record of trial, we are convinced beyond a reasonable doubt that the appellant is guilty as charged. In arriving at this conclusion, we have considered not only the results of the "thin layer chromatography" test but also the fact that Specialist Reddick obtained positive results from the "modified Duquenois-Levine" test, an analysis which is not dependent upon a matching of samples. Moreover, before findings the appellant judicially admitted that he knew at the time he was apprehended that he was in possession of drugs.

The findings of guilty and the sentence are affirmed.

Judge FELDER concurs.

JONES, Senior Judge, concurring:

While agreeing with Judge O'Donnell that appellant's initial detention was a reasonable intrusion on his liberty within the meaning of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), I believe a more important basis for the detention was the special relationship between the military commander and his men.

The appellant had been summoned to see his commander for counselling for another reason. He could have been compelled to wait for resolution of that matter alone. Servicemen, unlike their civilian counterparts, may legitimately be subjected to reasonable restrictions on their liberty and freedom of movement during the performance of their duties or pursuant to the lawful orders of their superiors. Elevating the effect of every such deprivation to constitutional proportions would have undesirable ramifications within the military sphere. *Cf. Middendorf v. Henry,* 425 U.S. 25 (1976); 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976). Major Fitchett, as a commander with all its attendant responsibilities, properly exercised those responsibilities in detaining the appellant. His actions under the circumstances were reasonable.