UNITED STATES, Appellee,

v.

Felix A. MUNIZ, Captain U.S. Air
Force, Appellant.

No. 52,681.
ACM 24666.

U.S. Court of Military Appeals.

Jan. 12, 1987.

For Appellant: *Major Michael Sofocle-
ous* (argued); *Colonel Leo L. Sergi* and
*Major Conrad C. Baldwin, Jr.* (on brief);
*Major Charles E. Ambrose, Jr.*

For Appellee: *Lieutenant Colonel Don-
al F. Hartman, Jr.* (argued); *Colonel Ken-
neth R. Rengert* (on brief).

OPINION

COX, Judge:

Appellant was charged with signing a
false official document (a leave request
form); conduct unbecoming an officer by
making a false statement to a noncommis-
sioned officer (that he had to go on leave to
Puerto Rico); and drunk driving, in viola-
tion of Articles 107, 133, and 111, Uniform
Code of Military Justice, 10 U.S.C. §§ 907,
933, and 911, respectively. At trial, he

made an unsuccessful motion to suppress the fruits of a search of his office credenza and any information derivative thereof. The military judge denied the motion on the grounds that appellant "did not have a reasonable expectation of privacy ... [in] the credenza in his office; and that the evidence was not obtained as a result of unlawful search or seizure."

Thereafter, appellant entered conditional pleas of guilty[1] to the false-document and false-statement charges and unconditional pleas of guilty to the drunk-driving charge. A general court-martial comprised of members sentenced him to dismissal from the service. The convening authority approved the sentence.[2] In its unpublished opinion, the Court of Military Review did not decide whether appellant had a reasonable expectation of privacy in the credenza. Instead, the court affirmed on the ground that the intrusion was justified by an emergency. We granted review of the following issue raised by appellant:

> WHETHER THE AIR FORCE COURT OF MILITARY REVIEW WAS WRONG IN HOLDING THAT A SEARCH OF THE APPELLANT'S LOCKED DRAWER OF A DESK IN WHICH HE HAD A REASONABLE EXPECTATION OF PRIVACY WAS PERMITTED UNDER MIL.R.EVID. 314(i).

Notwithstanding the above language, which begs the issue in assuming a reasonable expectation of privacy in the drawer, the questions now before the Court are whether appellant had a reasonable expectation of privacy in the contents of a government-owned credenza drawer and, if so, whether the intrusion into it was nonetheless justified. Under the circumstances of this case, I conclude that he did not have

such an expectation—at least vis-a-vis his commander—and, in any event, we hold that exigent circumstances justified the intrusion. The following facts are essentially undisputed.

## I

Appellant was second in command of the 96th Munitions Maintenance Squadron, Dyess AFB, Texas. During the last week of September and the first week of October, 1983, appellant's commander, Lieutenant Colonel John M. Rhoads, was on leave. Appellant was in charge of the squadron. Appellant, though married and the father of a young daughter, had evidently established some sort of relationship with Captain S, a female Air Force officer, not appellant's wife, who was stationed at Greenham Common RAF Base, England. Apparently, appellant made the acquaintance of this officer in Aviano, Italy, where they both had been stationed previously.

In late September 1983, during Lieutenant Colonel Rhoads' leave, appellant called Captain S and told her (falsely) that he had been granted leave and (accurately) that he would be coming to visit her for two weeks. Several days later, appellant told the unit first sergeant, Master Sergeant Thomas Little, that he had to go on leave to Puerto Rico because his uncle had died and he needed to care for his ailing mother (it was this statement that constituted the conduct-unbecoming charge). Indeed, it appears that appellant's uncle had recently died, but taking care of his mother was not what was animating appellant. His only purpose in saying this to Master Sergeant Little was to set the stage for his clandestine trip to England. To be consistent with the sto-

---

1. R.C.M. 910(a)(2), Manual for Courts-Martial, United States, 1984, provides:
   With the approval of the military judge and the consent of the Government, an accused may enter a conditional plea of guilty, reserving in writing the right, on further review or appeal, to review of the adverse determination of any specified pretrial motion. If the accused prevails on further review or appeal, the accused shall be allowed to withdraw the plea of guilty. The Secretary concerned may

prescribe who may consent for the Government; unless otherwise prescribed by the Secretary concerned, the trial counsel may consent on behalf of the Government.

2. The action of the convening authority directs: "The record shall be forwarded to the Secretary of the Air Force." This follows form 34, Appendix 16, Manual, *supra*. However, this form only applies when Article 61, Uniform Code of Military Justice, 10 U.S.C. § 861, is operative.

ry he told his wife, appellant also asked the first sergeant to tell her, should she inquire, that he was on a temporary duty assignment. The reason given for requesting this service was purportedly to not upset her because of his uncle's death.

A few days later, but still before the commander returned, appellant filled out and signed a leave request indicating a leave address, without telephone number, in Puerto Rico (this action resulted in the false-official-document charge). Placing the document on the commander's desk for his signature, appellant departed for England only hours before the commander returned. In accordance with appellant's instructions, the first sergeant duly briefed the commander on the crisis; and the request was approved. But for an untimely ear infection, nobody might have been the wiser.

What appellant could not anticipate was that his infant daughter would develop an ear infection of such proportions as to require surgery. Confronted with this situation, Mrs. Muniz came in to see Lieutenant Colonel Rhoads to enlist his assistance in getting in touch with appellant. The exact degree of medical urgency is not documented in the record, and it does not appear that Rhoads was so informed. Nonetheless, the impression was unmistakably conveyed to Rhoads that the situation was serious and that it was urgent that Mrs. Muniz consult with appellant before giving her consent to the operation. As can be imagined, Rhoads and Little sprang into action.

Through Red Cross and security police channels, all efforts were employed to contact appellant at his supposed leave address in Puerto Rico. When it was discovered that the address appellant left was insufficient, they sent for appellant's file from the personnel office and got a better address. Of course, the efforts to contact him in Puerto Rico were to no avail, as he was in England. It is certain that appellant's relatives in Puerto Rico were actually contacted because Mrs. Muniz received at least one phone call from a relative in Puerto Rico asking why the security police

were coming around looking for appellant. Having no idea at the time that her husband was supposedly in Puerto Rico, Mrs. Muniz became quite upset and called Lieutenant Colonel Rhoads about it. Again she impressed on him the urgency of contacting appellant.

Confronted with this turn of events, Rhoads and Little began to realize that appellant was not where he said he would be. Still motivated by the overriding need to put him in contact with his wife about his daughter, however, they began to play long shots. They both knew appellant had only recently arrived at the unit from his previous assignment in Italy. Master Sergeant Little also recalled that appellant had been receiving letters at the unit, through distribution, with an APO return number. Thinking that there might be a connection between his unexplained absence and the letters—or perhaps because they simply had nothing better to go on—the two "sleuths" decided to look in his office for the letters, on the chance that they might provide a clue. Not having any luck on the surfaces or in the unlocked drawers, they "jimmied" the lock on a drawer of appellant's credenza.

In the drawer, they found a stack of letters bearing an APO return address. According to their testimony, they merely copied the APO number, along with a "PSE box," leaving the letters in the drawer. Both Rhoads and Little insisted that they did not open the letters or even remove them from the drawer. As no sender's name appeared with the return address, they consulted a directory and found that the number corresponded to Greenham Common RAF Base, England. It so happened that another member of the unit, Staff Sergeant Prentiss, had also been assigned at Aviano. Rhoads and Little asked Prentiss if he knew of anyone who had been at Aviano but who was now at Greenham Common. Prentiss identified Captain S.

The effort then shifted to contacting Captain S. By dint of considerable persistence, they got through to her duty section

but found that she was on leave (she was touring the country with appellant). They left the message that, if appellant were there, he was to call Lieutenant Colonel Rhoads or Mrs. Muniz immediately, as there had been an emergency. When appellant and Captain S returned from their travels several days later, they found the note; appellant promptly called Lieutenant Colonel Rhoads. By then, the surgery had been successfully completed, and appellant was so informed. Rhoads also ordered appellant to return to base, which he did.[3]

## II

There is no question that the Fourth Amendment to the Constitution applies to servicemembers. *See United States v. Stuckey*, 10 M.J. 347, 349 (C.M.A. 1981). That amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The classic remedy for an illegal government search or seizure is the suppression at trial of the improperly obtained evidence and any other evidence derived therefrom.[4] *E.g., Wong Sun v. United States*, 371 U.S. 471, 484–86, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963); *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). Formerly, before an accused could avail himself of such remedies, he had the burden of establishing that he had "standing." In the context of searches, standing generally depended on the closeness and strength of one's connection to the premises or item searched. *Alderman v. United*

States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Under the present view, however, an accused must demonstrate a "legitimate expectation of privacy" in the place searched. *Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979); *Rakas v. Illinois*, 439 U.S. 128, 148–49, 99 S.Ct. 421, 432–33, 58 L.Ed.2d 387 (1978). *See also United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *United States v. Wisniewski*, 21 M.J. 370 (C.M.A.), *cert. denied,* —— U.S. ——, 106 S.Ct. 2281, 90 L.Ed.2d 723 (1986); *United States v. Portt*, 21 M.J. 333 (C.M.A. 1986); Mil.R.Evid. 311(a)(2), Manual for Courts-Martial, United States, 1984. Whether an accused had such an expectation appears to be a legal conclusion. *United States v. Vicknair*, 610 F.2d 372 (5th Cir.), *cert. denied,* 449 U.S. 823, 101 S.Ct. 83, 66 L.Ed.2d 25 (1980).

The evidence taken regarding the privacy conditions in the office was also essentially uncontroverted. Appellant, as second in command, had a separate office. This office and the credenza therein were government property. The principal purpose of the facility was to conduct military business. Though the door to the office was lockable, both the commander and the first sergeant had access to it by key. The credenza was allocated to appellant's exclusive use. It had recently arrived at the unit and had come equipped with a set of keys. Appellant had never been asked to turn in any of the keys, and no unit policy had been formulated concerning the nature

---

3. Captain S, who, unlike appellant, employed no deception in obtaining leave, evidently was counseled "for dating a married man" for her part in the escapade.

4. Note that, even if the intrusion into the drawer was illegal, there is a substantial possibility that the Government could prove either appel-

lant's absence from Puerto Rico or his presence in England through the testimony of willing witnesses, notwithstanding the fact that they may have been discovered as a direct result of a tainted intrusion. *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978).

of items unit members might keep in their work areas. From time to time in the course of their official duties, various staff members would enter each other's work areas, notwithstanding the absence of the occupant, to obtain work products. Appellant's office had previously been so entered, despite his absence, for such purposes. No one had ever entered his locked credenza drawers.

▇ Like the earlier civilian cases, our earlier military cases tended to emphasize the ownership interests in the property in question. *E.g., United States v. Doyle,* 1 U.S.C.M.A. 545, 4 C.M.R. 137 (1952); *United States v. Weshenfelder,* 20 U.S.C.M.A. 416, 43 C.M.R. 256 (1971); *United States v. Poundstone,* 22 U.S.C.M.A. 277, 46 C.M.R. 277 (1973); *United States v. Simmons,* 22 U.S.C.M.A. 288, 46 C.M.R. 288 (1973); *see also United States v. McClelland,* 49 C.M.R. 557 (A.C.M.R. 1974). It is now clear, however, in the civilian context that people can acquire legitimate expectations of privacy vis-a-vis law-enforcement authorities in property they do not own. *See Mancusi v. DeForte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968) (union office); *Katz v. United States,* 389 U.S. 347, 352, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967) (public telephone booth); *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) (hotel room). Thus, the fact that the credenza was government-owned does not automatically exclude the possibility that appellant may have acquired a legitimate expectation of privacy in its contents.

Nonetheless, the ownership status of property unquestionably plays a significant role in the expectation of privacy which society is willing to regard as reasonable.

*See Rakas v. Illinois,* 439 U.S. at 143–44 n. 12, 99 S.Ct. at 430–31 n. 12. It goes without saying that one has a much greater expectation of privacy in one's own property, on one's own premises, than in property owned by someone else, on that person's premises, for use in that person's business. Thus, in *Mancusi v. DeForte, supra,* the Court pointed out that Mancusi's expectation of privacy in the property seized (union records) related only to the police. There was no question that the "union higher ups" had access to it. There also seems to have been no doubt that a business supervisor could consent to the search of company property in the custody of a subordinate. *Mancusi v. DeForte, supra* 392 U.S. at 369–70, 88 S.Ct. at 2124. *Cf. United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797. Rhoads, as appellant's commander, was clearly such a business supervisor, and there appears to be no reason why he could not have had access to the government property in appellant's constructive custody.[5]

The only seemingly complicating factor in the military is that sometimes business-supervisor and law-enforcement authority merge in the person of the commander. That fact should not detain us, however. For one thing, the commander, as supervisor, should be in no worse position than his civilian counterpart with respect to access to "company" property. Certainly, it can potentially be far more critical for a military commander to have access to the assets under his supervision than a civilian supervisor. More importantly, the issue is the legitimacy of the individual's claim to

---

5. The government property was the drawer itself. Assuming the legitimacy of that entry, the return address, on what was undeniably private property, could apparently be seen in plain view. *See Illinois v. Andreas,* 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983). Moreover, it may be that an expectation of privacy cannot be maintained as to the external portion of an envelope that has been transmitted through the mails. *Cf. Maryland v. Macon,* 472 U.S. 463, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985) (magazines displayed in a bookstore); *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (pen register); *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) (bank records, checks, negotiable instruments). Further, in view of the various justifications for the entry into the drawer, *see infra,* it may well be that, even if Rhoads and Little had read the contents of the letters and thereby discovered appellant's location, such action would have been lawful under the circumstances.

privacy, not which hat the commander happens to be wearing that day.

In that regard, we note that the credenza, like any other item of government property within the command, was subject at a moment's notice to a thorough inspection. *United States v. Middleton,* 10 M.J. 123 (C.M.A. 1981). That omnipresent fact of military life, coupled with the indisputable government ownership and the ordinarily nonpersonal nature of military offices, could have left appellant with only the most minimal expectation—or hope—of privacy in the drawer vis-a-vis his commander. This minimal expectation must be distinguished from an unquestionably greater expectation of privacy and security vis-a-vis the rest of the world.

Additionally, it should be borne in mind that Rhoads, above all, was appellant's military commander. That particular relationship imposes a much greater degree of responsibility—in both directions—than is true of most civilian analogs.[6] As commander, Rhoads had a compelling duty to notify his subordinate of his child's trouble—if for no other reason than to permit him to return home and comfort her. Had Rhoads simply given up at the first dead end, had he merely contented himself with sitting on his hands and not even bothering to exert the minimal effort of breaking into this government-owned drawer, we would have had serious reservations about his fitness to command. *Cf. State v. Hetzko,* 283 So.2d 49, 52 (Fla. App. 1973) (officers would have been derelict in their duty if they acted otherwise). A servicemember has a right to expect that, if he is killed in battle, his leaders will not willingly surrender his body to the enemy. He should have no less reason to trust that, if his dependents are in trouble, his leaders will exert every human effort to find him. By not being where he led his commander to believe he would be, appellant virtually invited his commander to look in his credenza drawer if it became necessary to contact

him. Just as the rescuer's actions are foreseeable in the civil law, W. Prosser, *Handbook of the Law of Torts* § 44 (4th ed. 1971), appellant should have foreseen Rhoads' actions. Viewed in this light, it was really appellant's misconduct that dispersed whatever lingering remnants of privacy, vis-a-vis his commander, he may have retained in the drawer.

There is another potentially relevant aspect of command responsibility, although not specifically invoked by Rhoads here. That is, a commander has a duty at all times to be able to account for his people. By appellant's breaching his duty to his commander, and by that fact coming to the commander's attention, Rhoads' obligation to account for him was triggered. Just as above, this obligation should have been foreseen by appellant. For this reason also, appellant cannot reasonably insist that the contents of his government-issued credenza should have remained inviolate. Indeed, it is mildly ironic that appellant should think he could leave behind some sacrosanct aura of privacy in his government-supplied credenza, while he himself was free to run about the world and deceive his superiors about his location.

■ For these several reasons, the military judge was correct in concluding that appellant had no grounds to complain of a violation of his Fourth Amendment rights against unreasonable searches and seizures.

### III

■ Even if appellant had possessed a legitimate expectation of privacy in the drawer, he would still not have prevailed. In this respect, we agree also with the Court of Military Review that the emergency, as reasonably perceived by Rhoads and Little, justified the entry. The Fourth Amendment consists of two main components. The first part refers to the right of the people to be free of unreasonable searches. The second part describes the

---

**6.** Indeed, it is the breach of this very responsibility on appellant's part that brings him before

us this day.

circumstances under which warrants may issue. The interrelationship between the two parts has historically been expressed in terms such that searches without a valid warrant are unreasonable, unless they fall within one of the recognized exceptions to the warrant requirement; and the burden is on the Government to show that the search fits within an exception. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); *United States v. Jeffers*, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); *United States v. Cisneros-Mireles*, 739 F.2d 1000, 1002 (5th Cir. 1984).[7]

One such exception that is clearly established is the "emergency" doctrine, the basis upon which the Court of Military Review found that Lieutenant Colonel Rhoads' actions were reasonable. A classic statement of that doctrine is found in *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir.), *cert. denied*, 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963), where then Judge Burger stated for the court:

[A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. Fires or dead bodies are reported to police by cranks where no fires or bodies are to be found. Acting in response to reports of "dead bodies," the police may find the "bodies" to be common drunks, diabetics in shock, or distressed cardiac patients. But the business of policemen and firemen is *to act*, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process. Even the apparently dead often are saved by swift police response. A myriad of circumstances could fall within the terms "exigent circumstances" ... e.g., smoke coming out a window or under a door, the sound of gunfire in a house,

7. There is some question as to just how inflexible these categories of exceptions to the warrant requirement are. *United States v. Zepp*, 466 F.Supp. 1062, 1065 (E.D. Pa. 1978). Indeed, the number of situations which have been found to justify warrantless searches or intrusions into privacy, based on conclusions of reasonableness, has tended to proliferate over the years. *See, e.g., New Jersey v. T.L.O.*, 469 U.S. 325, 342, 105 S.Ct. 733, 744, 83 L.Ed.2d 720 (1985) (school official's search of student based on "reasonable grounds for suspecting" presence of evidence); *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (prison searches); *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977) (border searches); *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (automobile inventories); *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (search of person incident to arrest); *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) (search for weapon to protect public from its falling into improper hands); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (consent); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plain view); *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (search of immediate area incident to arrest); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (stop and frisk); *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (hot pursuit); *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (imminent destruction of evidence); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) (movable vehicles); *United States v. Edwards*, 498 F.2d 496 (2d Cir. 1974) (airport searches); *Wayne v. United States*, 318 F.2d 205 (D.C. Cir.), *cert. denied*, 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963) (emergencies).

In addition, we have held that military conditions justified several types of warrantless intrusions into what, in other circumstances, might have involved protected privacy rights. *Murray v. Haldeman*, 16 M.J. 74 (C.M.A. 1983) (compulsory urinalysis); *United States v. Middleton*, 10 M.J. 123 (C.M.A. 1981) (inspections); *United States v. Harris*, 5 M.J. 44 (C.M.A. 1978) (random gate searches); *United States v. Kazmierczak*, 16 U.S.C.M.A. 594, 37 C.M.R. 214 (1967) (inventory of confined servicemember's belongings). This catalog suggests that "[t]he ultimate standard set forth in the Fourth Amendment is reasonableness," *Cady v. Dombrowski, supra* 413 U.S. at 439, 93 S.Ct. at 2527; *see South Dakota v. Opperman, supra* 428 U.S. at 370 and n. 5, and 373, 96 S.Ct. at 3097 and n. 5, and 3099, as opposed to some previously frozen list of "exceptions."

threats from the inside to shoot through the door at police, reasonable grounds to believe an injured or seriously ill person is being held within.

*See also Root v. Gauper*, 438 F.2d 361 (8th Cir. 1971).

In all candor, there is some question in our minds as to whether the need to *contact appellant* rose to the level of a true emergency in the sense of *Wayne v. United States, supra.* Assuming that the operation itself was a medical necessity, Mrs. Muniz was present and able to consent to the operation, as she evidently later did in appellant's absence. There is no suggestion that she was so irrational as to be unable to make a responsible decision. Moreover, we cannot simply assume that the local medical authorities would have refused, or been precluded, from operating in a true emergency. Certainly, there have been many cases where judicial authorities have ordered necessary medical treatment for minors, even over the objections of the parents. *See* Annot., 97 A.L.R. 3d 421 (1980); Annot., 52 A.L.R. 3d 1118 (1973). In other words, it was not established that the operation could not have been authorized *but for* appellant's approval.

However, whether a true emergency actually existed is beside the point. Like the courts below, we must examine the circumstances as they appeared to Rhoads and Little at the time they acted. *United States v. Erb*, 596 F.2d 412, 419 (10th Cir.), *cert. denied*, 444 U.S. 848, 100 S.Ct. 97, 62 L.Ed.2d 63 (1979). Based on the information presented to them, we can hardly fault them for electing not to gamble on the well-being of the child. Up to and including the time when the credenza was searched and the call to England was placed, there appears to be no doubt that Rhoads and Little were operating with the best of intentions and on the assumption that obtaining appellant's consent, or at least advice, was imperative. Therefore, we also agree with the Court of Military Review that the search of the drawer was reasonable under the emergency exception to the Fourth Amendment.

The decision of the United States Air Force Court of Military Review is affirmed.

Judge SULLIVAN did not participate.

EVERETT, Chief Judge (concurring in the result):

Under some circumstances, a government employee or servicemember may have a reasonable expectation of privacy as to the contents of a desk or locker supplied by the Government. In such a case, he would have standing to object to the fruits of the search of such property. *Cf. United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Even then, however, an inspection or search of the desk or locker may be quite reasonable—and so in conformity with the Fourth Amendment. For example, health-and-welfare inspections for contraband are reasonable. *United States v. Middleton*, 10 M.J. 123 (C.M.A. 1981). Likewise, under the facts of this case, whatever appellant's expectation of privacy as to his credenza, the commander's search of it in order to ascertain his whereabouts was reasonable; and the evidence derived from that search was properly admitted at his trial.