**464**

UNITED STATES, Appellee

v.

Archie J. SALAZAR, Private First
Class U.S. Army, Appellant.

No. 95–0425.
Crim.App. No. 9302040.

U.S. Court of Appeals for
the Armed Forces.

Argued March 15, 1996.

Decided Sept. 18, 1996.

For Appellant: Captain Richard E. Burns
(argued); Colonel Stephen D. Smith, Lieu-
tenant Colonel John T. Rucker, Major Mi-
chael L. Walters (on brief); Major Fran W.
Walterhouse.

For Appellee: Major Lyle D. Jentzer (ar-
gued); Colonel John M. Smith and Lieuten-
ant Colonel Eva M. Novak (on brief); Cap-
tain John G. Giovannelli.

Amicus Curiae in Support of Neither Par-
ty: Calvin Anderson and Drew Swank (ar-
gued); Fredric Lederer; Wendy Vann and
Charles Young (law students) (on brief)—For
College of William and Mary School of Law.

*Opinion of the Court*

COX, Chief Judge:

Appellant was convicted by general court-
martial, military judge alone, at Fort Hood,
Texas, pursuant to his conditional pleas, of
disobedience of a lawful order; damage to
private property; and larceny (2 specifica-
tions), in violation of Articles 92, 108, and

121, Uniform Code of Military Justice, 10 USC §§ 892, 908, and 921, respectively. The sentence adjudged was a bad-conduct discharge, confinement for 15 months, and reduction to Private E–1. The Court of Criminal Appeals affirmed the findings and sentence on November 7, 1994.

We granted review[1] of one issue, and specified review of an additional issue as follows:

### Granted Issue

WHETHER THE MILITARY JUDGE ERRED IN RULING THAT PFC SALAZAR LACKED STANDING, UNDER MILITARY RULE OF EVIDENCE 311, TO CHALLENGE THE UNLAWFUL GOVERNMENT SEARCH OF THE BEDROOM AND CLOSET AT 2301 TYLER, KILLEEN, TEXAS.

### Specified Issue

WHETHER, IF THERE WAS STANDING UNDER MILITARY RULE OF EVIDENCE 311 TO CHALLENGE THE SEARCH AT 2301 TYLER, KILLEEN, TEXAS, THERE WAS A VALID CONSENT TO SEARCH.

With regard to the granted issue, we hold that the Court of Criminal Appeals and the military judge erred in deciding that Private First Class (PFC) Salazar did not have a reasonable expectation of privacy in the residence located at 2301 Tyler, Killeen, Texas.

## I

■ Whether PFC Salazar had a reasonable expectation of privacy in the residence at 2301 Tyler in order to properly contest the seizure of property from the residence is a question of law, which will be reviewed *de novo*. *Cf. Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980); *Minnesota v. Olson*, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); *see generally* 1 S. Chil-

dress and M. Davis, *Federal Standards of Review* § 2.13 at 2–92 (2d ed. 1992).

The military judge rendered findings of fact based upon evidence presented at the session under Article 39(a), UCMJ, 10 USC § 839(a), which appear to be undisputed.

■ PFC and Mrs. Salazar lived in a house shared with Mrs. Salazar's sister and brother-in-law, the Buinos, at 2301 Tyler, Killeen, Texas, for the period of July 2–9, 1993. According to Mrs. Salazar, they had moved into the house to improve their marital relationship and were living in the house rent-free, although they had paid approximately $200 toward expenses upon moving into the home. The areas of the home described as "common areas" were used by all and were limited to the living room, the kitchen, and the dining room. Certain areas of the house were used primarily or exclusively by the Salazars, such as their bedroom, a nursery, a shared bathroom, hall closet and the garage. In fact, all parties agree that the hall closet was used exclusively by PFC Archie Salazar. Mrs. Salazar's sister and brother-in-law, the Buinos, exclusively occupied their bedroom and bathroom. Although each couple had access to the other's living quarters, they respected each other's privacy.

On July 9, 1993, the appellant's commander, Captain (CPT) Duke, ordered PFC Salazar to pack up his belongings and move into the barracks. This order was issued as a result of a telephone call made by Mrs. Salazar's mother, reporting that PFC Salazar had struck his pregnant wife. CPT Duke ordered that PFC Salazar "gather up his personal hygiene items and TA–50, those types of things," and had him move into the barracks. However, PFC Salazar left a substantial number of personal belongings in both the hall closet and the bedroom. PFC Salazar continued to visit his wife at the marital residence, although it was "against the wishes of Mr. and Mrs. Youngberg–Bui-

---

1. We heard oral argument in this case at the Marshall–Wythe School of Law, College of William & Mary, Williamsburg, Virginia, as part of the Court's "Project Outreach" Program. *See*

*United States v. Raymond*, 38 MJ 136, 137, n. 1 (CMA 1993); *United States v. Frazier*, 34 MJ 194, 195 n. 1 (CMA 1992).

no" and CPT Duke's order. Appellant was scheduled to remain in the barracks for approximately 2 to 4 weeks, awaiting processing of an administrative discharge.

CPT Duke's order read as follows:

09 July 93. PFC Salazar, you will move into the billets immediately. You will reside in the billets until your discharge is effective. A nightly curfew of 2130 hrs. will be verified by the CQ [Charge of Quarters]. You will not see your wife without an escort consisting of your TC, PSG [Platoon Sergeant], PLDR [Platoon Leader], ISG [First Sergeant], or Commander. You may talk to your wife on the phone. Violation of any of the above orders will result in me requesting a court-martial and confinement in the post stockade. Results of a court-martial could include loss of all pay and allowances, dishonorable, general [sic], bad conduct, or other than honorable discharge [sic], and confinement either here or at Ft. Leavenworth. All you must do to avoid further punishment is stay out of trouble and carry out the orders of your superiors.

You have been moved into the billets because you hit your wife. This conduct is unacceptable and will not be tolerated. Any further unsatisfactory performance or conduct will be met with immediate punishment. If you stay out of trouble until your discharge, it will be a lot easier for you.

The only reason that PFC Salazar left his marital home was in response to the direct order given by CPT Duke on July 9, 1993.[2]

Mil.R.Evid. 311(a), Manual for Courts–Martial, United States (1995 ed.), states:

Evidence obtained as a result of an unlawful search or seizure made by a person acting in a governmental capacity is inadmissible against the accused if: ... [T]he

2. The judge made the following specific findings of fact:

I make the following findings: From the period of 2 through 9 July, PFC Salazar and his wife lived in the home of Mr. and Mrs. Youngberg–Buino. Mrs. Youngberg–Buino being the sister-in-law of PFC Salazar and the sister of PFC Salazar's wife. During the period 2 through 9 July, PFC Salazar and his wife had for their own use in the home, a bedroom, a room fixed-up as a nursery, a shared bathroom, and a hallway closet. The other parts of the home were common areas, except for the bathroom and bedroom, which were used by Mr. and Mrs. Youngberg–Buino. I find that Mr. and Mrs. Youngberg–Buino retained the right of access to the entire house; however, they refrained from going into areas occupied by PFC Salazar and his wife. *On the 9th of July, as a result of a phone call from Mrs. Salazar's mother to Captain Duke, PFC Salazar's commander, Captain Duke ordered PFC Salazar into the barracks. Captain Duke's intention was to have PFC Salazar remain in the barracks, living in the barracks, until PFC Salazar was discharged, which Captain Duke anticipated to be approximately 2 to 4 weeks from the 9th of July. Captain Duke instructed PFC Salazar that he could visit the home at 2301 Tyler only with an escort.* PFC Salazar brought some clothing, some military gear, and a stereo, and at that point, moved into the barracks. PFC Salazar, in fact, visited the home at 2301 Tyler on several occasions without an escort. *Those visits were against the wishes of Mr. and Mrs. Youngberg–Buino, and in violation of the* *commander's order.* From the period of 9 through 26 July, Mrs. Salazar continued to reside in the home at 2301 Tyler. The defendant, PFC Salazar, had some property, clothing, furniture, which remained at 2301 Tyler while he was living in the barracks. In light of the Youngberg–Buino's plan to move to a smaller home, where the accused, PFC Salazar, would not be welcome, and their belief that PFC Salazar would remain in the barracks until at least the time when they moved, I find that it was the understanding of both the Salazars and the Youngberg–Buinos that PFC Salazar would not be returning to the Youngberg–Buino home at 2301 Tyler, other than as a temporary visitor, and then, such visits would be under strained circumstances. *To the extent—again, to the extent that PFC Salazar visited the home during the period 9 through 26 July, it was in violation of the commander's order.* I find that effective 9 July, PFC Salazar no longer lived at 2301 Tyler. I find that he had no responsibility for the home or any areas within the home. He had no control over who entered the home. He had no control over who entered any particular room within the home. He had no possessory interest in the home or control over the home. I find that he had no reasonable expectation of privacy in the home. Accordingly, I find that the defense has failed to meet their burden of showing that he had a reasonable expectation of privacy in the home, as described in Military Rule of Evidence 311(a)(2), and consequently, has no standing to object to evidence which was taken from the home on the 26th of July.
(Emphasis added.)

accused had a reasonable expectation of privacy in the person, place or property searched; the accused had a legitimate interest in the property or evidence seized when challenging a seizure; or the accused would otherwise have grounds to object to the search or seizure under the Constitution of the United States as applied to members of the armed forces.

Although we recognize that the accused did not have a legitimate expectation of privacy in the actual property seized because the items taken were government property, we hold that he nevertheless had standing to contest the seizure because he had a legitimate expectation of privacy in the home located at 2301 Tyler, Killeen, Texas. Mil. R.Evid. 316(d)(3); *cf. Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); *United States v. Muniz,* 23 MJ 201 (CMA 1987); *United States v. Simmons,* 22 USCMA 288, 46 CMR 288 (1973); *United States v. Weshenfelder,* 20 USCMA 416, 43 CMR 256 (1971).

PFC Salazar did not voluntarily vacate the premises at 2301 Tyler. In fact, he was ordered to temporarily live in the barracks by CPT Duke. It is clear from the written order, as well as CPT Duke's testimony, that all parties understood that PFC Salazar was to reside in the barracks temporarily. The written order, coupled with CPT Duke's verbal order to only "gather up his personal hygiene items" and military gear, makes clear the fact that a temporary move was envisioned. This move was no different in kind from a vacation or a temporary deployment. The written order implicitly states that PFC Salazar was to live in the barracks approximately 2 to 4 weeks; this is a time period much shorter than an actual deployment. Moreover, it would be illogical if the existence of a servicemember's expectation of privacy in his or her private residence depended solely on military orders.[3] The issuance of orders would then be the predicate event to every search. We will not create a policy whereby the existence of standing turns upon the command's wishes, rather than the servicemember's legitimate privacy expectations.

The unique familial relationship extant in this case allowed PFC Salazar to retain his expectation of privacy in the home while away. Moreover, PFC Salazar's intent to return home is clear, not only from the content of CPT Duke's orders, but through the continued and exclusive use of the hall closet and retention of use of the bedroom for storage of various personal items. At no time did either he or his wife express any intent to live separate and apart. The temporary departure of PFC Salazar because of military orders does not convert the marital home into an abandoned guest house or a former residence. *See, e.g., United States v. Ayala,* 22 MJ 777 (ACMR 1986), *aff'd,* 26 MJ 190 (CMA 1988). Additionally, it is clear from the record that PFC Salazar continued to use these areas of the house for this purpose without objection. *See United States v. Aloyian,* 16 USCMA 333, 36 CMR 489 (1966). Thus, we hold that PFC Salazar continued to maintain a reasonable expectation of privacy with regard to the residence.

## II

Our holding that appellant had standing to contest the seizure of the stolen goods does not end the inquiry in this case. However, the specified issue is not ripe for review because the parties did not litigate the questions presented. Thus, further proceedings are required.

The specified issue presents an unprecedented question in military criminal law, namely: Under what facts and circumstances can a military dependent wife turn over contraband to a military policeman, thus vitiating the servicemember's own expectation of privacy in the place where the goods are stored? *See, e.g., Amos v. United States,* 255 U.S. 313, 317, 41 S.Ct. 266, 268, 65 L.Ed. 654 (1921) [question "whether it is possible for a

---

**3.** Yet the military judge specifically relied upon this fact in order to reach this conclusion. *See* n. 2, *supra* (emphasized portions). We are mindful, however, that in some cases, military orders might well provide the circumstances that defeat an expectation of privacy in a particular place. Such is not the case here.

wife, in the absence of her husband, ... to waive his constitutional rights" not decided].

The following facts are pertinent to resolution of this question but do not fully resolve it. Military police arrested PFC Salazar for the offenses for which he was ultimately charged. That same day, Investigator Gambert, a military police officer, went to the house at 2301 Tyler and was denied access to search by the appellant's brother-in-law, Mr. Buino. Investigator Gambert then left a message for Mrs. Salazar, requesting that she telephone him. Mrs. Youngberg–Buino, appellant's sister-in-law, telephoned Investigator Gambert to return his message. At some point during this exchange, Mrs. Salazar accepted the telephone to speak with Investigator Gambert. Investigator Gambert then stated to Mrs. Salazar that PFC Salazar "wanted her to bring all the electronic equipment that was at the house" to him at the military police station, although there was some dispute as to whether the adjective "stolen" was used to describe the equipment. No independent consent to search or seize was sought from or given by Mrs. Salazar.

After Mrs. Salazar received the telephone call from the military agent, she collected numerous "electronic items" from the house and delivered them to the military police station. Only after she brought the equipment to the military police station and visited with her husband in the stockade did she discover that the military agent had lied to her. Investigator Gambert testified that Mrs. Salazar, who was then over 8–months pregnant, became extremely upset and threatened to kill her unborn child. This emotional turmoil resulted from Mrs. Salazar's discovery that her husband had not consented to seizure of the electronic items and that Investigator Gambert had lied to her. No consent form was ever signed by either Mrs. Salazar or PFC Salazar.

Ultimately, and depending upon the facts, we must decide what tactics military law enforcement officials may use in order to validly obtain consents to search. Consent is not valid unless "freely and voluntarily given." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854

(1973); Mil.R.Evid. 314(e)(4), Manual, *supra*. The determination as to whether consent is voluntarily given "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte, supra* at 227, 93 S.Ct. at 2048; *see* Mil. R.Evid. 314(e)(4). Factors to be considered as to whether consent was voluntarily given include: age, intelligence, experience, length of military service, whether the environment was custodial or coercive, and knowledge of the right to refuse consent. *Schneckloth v. Bustamonte, supra* at 226–27, 93 S.Ct. at 2047–48 [enumerated the above factors (except military service) for voluntariness of confessions, and applied these to consent searches]; ·*see* Mil.R.Evid. 314(e)(4) & (5); *United States v. Watson*, 423 U.S. 411, 424–25, 96 S.Ct. 820, 828–29, 46 L.Ed.2d 598 (1976); *United States v. Goudy*, 32 MJ 88, 91 (CMA 1991); *United States v. Middleton*, 10 MJ 123, 133 (CMA 1981).

■ The Government must prove that consent was voluntary by clear and convincing evidence. Mil.R.Evid. 314(e)(5). Consent must be "more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 549, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968); *United States v. McClain*, 31 MJ 130, 133 (CMA 1990); Mil. R.Evid. 314(e)(4).

■ Law enforcement officials may properly use sting operations and informants in order to gain valid consent or to induce criminals to bring stolen· goods into plain view. *See, e.g., Lewis v. United States*, 385 U.S. 206, 209, 87 S.Ct. 424, 426, 17 L.Ed.2d 312 (1966) [federal undercover agent who misrepresented identity on the telephone and was invited to petitioner's home to execute narcotics transactions could properly seize illegal narcotics in petitioner's home as legitimate invitee]; *Hoffa v. United States*, 385 U.S. 293, 302, 87 S.Ct. 408, 413–14, 17 L.Ed.2d 374 (1966) [no rights violated under Fourth Amendment by failure of government informant to disclose identity to petitioner; Hoffa relied not on "security of the hotel room" to make incriminating statements, but on "misplaced confidence" that informant "would not reveal" statements]. However,

secret searches made after lawful entry, "by stealth, or through social acquaintance, or in the guise of a business call" are contrary to the Fourth Amendment. *Gouled v. United States,* 255 U.S. 298, 306, 41 S.Ct. 261, 264, 65 L.Ed. 647 (1921).[4] There is no bright-line rule, and each case must be decided on its particular facts. *United States v. McClain, supra.* All of this Court's precedents seem to deal with direct contact between law enforcement officials and those targets who have a prior disposition to commit criminal acts. *See United States v. Bell,* 38 MJ 358 (CMA 1993); *United States v. Cooper,* 35 MJ 417 (CMA 1992). We know of no military case wherein a military policeman has lied to a military spouse in order to obtain her consent to search her husband's protected area of privacy and gain her consent to hand over contraband to the police.

In the case before us, the question is whether a false assertion made to a military spouse by a military investigator is a legitimate tactic in obtaining valid consent. In *Bumper,* the Court held that the officers' assertion that they had a search warrant negated any meaningful consent. 391 U.S. at 548, 550, 88 S.Ct. at 1791, 1792. "Where there is coercion there cannot be consent." *Id.* at 550, 71 S.Ct. at 888. In this case, the court below should consider whether the claim that "I have consent" or rather "your husband said to bring the items to me," instead of, "I have a warrant," is analogous to the scenario in *Bumper,* and therefore equals acquiescence rather than consent. *See Bumper v. North Carolina* and *United States v. McClain, both supra.* It is difficult to draw any meaningful distinction between a claim of a lawful search warrant and a claim of consent.

From the record, the facts are unclear as to the specifics of the interaction between Mrs. Salazar and Investigator Gambert. There are no findings of fact as to Mrs. Salazar's age, intelligence, education, military service, or knowledge as to whether consent may be refused. Moreover, it is unclear whether Mrs. Salazar was approached for her consent. Thus, we are unable to render a decision based upon the record currently before us.

Some may argue that under the facts of this case, there was no search because Mrs. Salazar brought the items from within the confines of a protected area into "plain view." However, on quite similar facts, the Supreme Court of Pennsylvania has addressed the question of a police ruse used against the wife of a defendant to gain seizure of contraband. *Cf. Commonwealth v. Wright,* 411 Pa. 81, 190 A.2d 709 (1963) [evidence of contraband money obtained by police after gaining entry to murder suspect's home by falsely telling suspect's wife that her husband "had admitted the crime and had sent them for the 'stuff,'" held illegal and invalid. *Id.* at 710.]. The court said: "Even if we assume, as the Commonwealth contends, that the evidence was obtained without a search, under the circumstances, this is not controlling. The seizure was gained through the use of deceit and misrepresentation. This vitiated the seizure just as effectively as if a search were involved. In addition, it was not made legal by the fact of what was obtained or seized." 190 A.2d at 711. Ultimately, the question that must be faced is whether a servicemember's spouse may "depend" upon the military authorities to tell the truth in

---

4. The facts important to the holding in this case are:

"[T]hat in January, 1918, it was suspected that the defendant, Gouled, and Vaughan were conspiring to defraud the Government through contracts with it for clothing and equipment; that one Cohen, a private in the Army, attached to the Intelligence Department, and a business acquaintance of defendant Gouled, under direction of his superior officers, pretending to make a friendly call upon the defendant, gained admission to his office and, in his absence, without warrant of any character, seized and carried away several documents; that one of these papers, described as 'of evidential value only' and belonging to Gouled, was subsequently delivered to the United States District Attorney, and was by him introduced in evidence over the objection of the defendant that possession of it was obtained by a violation of the Fourth or Fifth Amendment to the Constitution; and that the defendant did not know that Cohen had carried away any of his papers until he appeared on the witness stand and detailed the facts with respect thereto as we have stated them[.]" *Gouled v. United States,* 255 U.S. 298, 304–05, 41 S.Ct. 261, 263, 65 L.Ed. 647 (1921).

official matters. Our dissenting colleagues imply otherwise.

The decision of the United States Army Court of Criminal Appeals is set aside as to specification 1 of Charge I and the sentence. The record of trial is returned to the Judge Advocate General of the Army for submission to a convening authority to order a *DuBay* [5] hearing on this question.[6] If such a hearing is deemed impracticable, specification 1 of Charge I may be dismissed and the sentence reassessed based on the remaining findings of guilty.

Judges SULLIVAN and GIERKE concur.

EVERETT, Senior Judge (concurring in part and dissenting in part):

I agree with the majority opinion that appellant did not lose standing as a result of his involuntary relocation from the house that he shared with his wife and in-laws to the post where he was assigned. Therefore, if either civilian or military police had entered the house without a warrant to search for and seize evidence of crime, he would be entitled to suppress that evidence.

The evidence at issue was not seized from within the house by investigators; instead, it was taken by appellant's wife to the military police station. The Fourth Amendment provides special protection to a person who is inside his home or office, as well as to a person's property that is located there. However, a person's reasonable expectation of privacy—which is the focus of the Fourth Amendment, *cf. Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)—does not apply to that person's property when it is taken outside the home or office and delivered to a police station. In my view, it is immaterial that delivery of the property was induced by a ruse or deception.

In *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), the police officers, who misrepresented that they had obtained a search warrant, were purporting to act under legal authority. Accordingly, any "consent" derived from that false assertion was coerced, involuntary, and invalid. *Id.* at 549, 88 S.Ct. at 1792. Here, on the other hand, the military police investigator never represented to appellant's wife that he possessed any lawful authority that required her to deliver the stolen property to him. Moreover, appellant makes no claim that Mrs. Salazar acted as an agent of the Government and such a claim would have no basis.

If, because of a domestic dispute, Mrs. Salazar had decided to deliver appellant's stolen property to the police, the Fourth Amendment would not preclude its reception in evidence. The result would be the same, even if the police had made misrepresentations to her that were designed to foment marital discord and thereby motivate her to remove the property from the marital premises and deliver it to the police. In my view, it makes no difference that, instead, the deception here concerned a purported consent by appellant to his wife's removal of the property from the premises and its delivery to the military police station.

In short, when property is taken outside someone's dwelling or office without the compulsion of any claimed lawful authority and placed in plain view of a police officer, all reasonable expectations of privacy terminate; so the exclusionary rule does not apply. Accordingly, I would affirm the conviction without requiring any remand for further consideration by a lower court.

CRAWFORD, Judge (dissenting):

I dissent. The majority erroneously grants standing to an abusive husband who was ordered from his in-law's house until discharged.

---

5. *United States v. DuBay,* 17 USCMA 147, 37 CMR 411 (1967).

6. With all due respect to our dissenting colleague, this is not a case where the police "outfoxed" a criminal. This is a case where a military policeman lied to the young wife of a junior enlisted member of the Army, rather than take the time and go to the trouble to obtain a search warrant as required by our Constitution. If the Army wants to encourage its military police to "outfox" the dependents of its members, a rehearing will provide an opportunity to prove that the means are justified by the ends.

## FACTS

Appellant and his wife were permitted to move in with his wife's sister and brother-in-law. However, after appellant physically assaulted his wife, his company commander ordered him to return to the barracks and "not [to] see his wife without an escort ... and that violation of these orders could result in further punishment or discharge." Additionally, the commander ordered a night curfew starting at 2130 hours. Appellant signed the counseling statement with an acknowledgement that he understood the order. Going to his in-law's house without an escort would violate the order.

Appellant's sister-in-law testified that appellant returned to their house two or three times but always after his relatives were in bed. The judge found that these "visits were against the wishes of [the in-laws] and in violation of the commander's order." Appellant was told by his in-laws not to return to their house. Appellant's sister-in-law erroneously thought that his commander knew that he was coming back to the house unescorted. However, on redirect examination by the prosecution, she said that "it was clear" that it was "illegal" for him to be at the house.

Later appellant's wife called Investigator Gambert, "and [he] told her that her husband wanted her to bring all the electronic equipment that was at the house" to him at the military police station. After this conversation, she collected the items and delivered them to the police station. The delivery of these items is the subject of this dispute.

The military judge found appellant had "no responsibility"; "no control"; "no possessory interest in the home"; and was required to remain in the barracks until discharged. Thus, he had no "reasonable expectation of privacy in the home."

## DISCUSSION

Our standard of review is to "give due deference" to the judge's findings of fact and accept them "unless ... unsupported by the evidence of record or ... clearly erroneous." *United States v. Burris*, 21 MJ 140, 144 (CMA 1985). Questions of law are reviewed

*de novo*. *United States v. Ayala*, 43 MJ 296, 298 (1995).

The history of the Fourth Amendment is rooted in the effort to prevent the King's messengers from rummaging through an individual's private quarters and to prevent customs officials from carrying out warrants issued for an indefinite time period that were not based on probable cause. *See* Amsterdam, *Perspectives On The Fourth Amendment*, 58 Minn.L.Rev. 349, 362–63 (1974).

The modern understanding of the Fourth Amendment as interpreted by the courts encompasses the view that where there has been an illegal government search or seizure and an objection by a party with standing, the courts will exclude the evidence unless an exception to the exclusionary rule is applicable. Mil.R.Evid. 311(a), Manual for Courts-Martial, United States (1995 ed.); *see also United States v. Sullivan*, 42 MJ 360 (1995); *United States v. Kaliski*, 37 MJ 105 (CMA 1993); *United States v. Lopez*, 35 MJ 35 (CMA 1992). A search or seizure is not illegal if it is a valid warranted or warrantless search or seizure. Mil.R.Evid. 311–17. One of the exceptions to the warrant requirement is voluntary consent to the search and seizure. Mil.R.Evid. 314(e). Appellant has not established his standing or the illegality of the search and seizure.

*Standing.* Mil.R.Evid. 311(a)(2) provides that evidence should not be suppressed unless there is standing by the party objecting. The Supreme Court has stated:

[A]s a general proposition, the issue of standing involves two inquiries; first, whether the proponent of a particular legal right has alleged "injury in fact," and, second, whether the proponent is asserting his own legal rights and interests rather than basing his claim for relief upon the rights of third parties.

*Rakas v. Illinois*, 439 U.S. 128, 139, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978); *see also United States v. Padilla*, 508 U.S. 77, 81–82, 113 S.Ct. 1936, 1939, 123 L.Ed.2d 635 (1993). Standing is designed to vindicate an individual's personal right to privacy. Individuals have a right to privacy in their freedom of

movement [1], legitimate [2] interest in personal property [3], and legitimate interest in real property whether they are the owner, lessee, or guest.

Appellant did not lose his standing with regard to his personal property or freedom of movement by being removed from his in-law's home. However, he did lose his right to object to a search of the in-law's home because he did not retain any legitimate interest in the home. Certainly an overnight guest with a toothbrush has standing. *Minnesota v. Olson, supra* (overnight guest present at time of search). However, appellant was not that kind of individual. Appellant had been ordered to return to the barracks and could not return to his in-law's house without an escort. The fact that he did return was in violation of the order. Additionally, appellant's in-laws told him not to return to their house. Thus, appellant had no legitimate interest or expectation of privacy in the house, was not present at the time of the search, and did not have a legitimate interest in the stolen property seized. *People v. Johnson,* 237 Ill.App.3d 860, 178 Ill.Dec. 659, 663, 605 N.E.2d 98, 102 (3 Dist. 1992).

While he was the target of the search in question, this does not give him standing. *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

The judge's findings of fact that appellant had no responsibility and no control and thus no legitimate possessory interest in the house are not clearly erroneous, and the judge did not apply an erroneous rule of law.

*Voluntary Consent.* Assuming standing, there was "voluntary" consent that was "not the result of duress or coercion, express or implied." *Schneckloth v. Bustamonte,* 412 U.S. 218, 248, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973). The courts have indicated that deception as to identity or purpose to gain entry does not vitiate an otherwise voluntary consent.[4] The issue here centers on a third party's voluntary consent, that is, appellant's wife's consent.

There have been numerous instances of misplaced confidence where the Supreme Court has held that there has not been a violation of the Fourth Amendment. In *Lewis v. United States,* 385 U.S. 206, 211, 87 S.Ct. 424, 427, 17 L.Ed.2d 312 (1966), an undercover narcotics agent telephoned Lewis about the possibility of purchasing drugs at Lewis' house. Based on subsequent arrangements, a sale was made at Lewis' house. Chief Justice Warren, speaking for the Court, rejected the defendant's argument that the privacy interest in the home required protection because the defendant had "converted" his home "into a commercial center" to transact "unlawful business." Likewise, in *Hoffa v. United States,* 385 U.S. 293, 302, 87 S.Ct. at 413–14, 17 L.Ed.2d 374 (1966), the Court held conversations with an undercover agent in a hotel room were not protected by the Fourth Amendment because of "misplaced confidence" that the union official "would not reveal" his statements.

These cases stand for the proposition that an affirmative misrepresentation does not undermine what would otherwise be voluntary consent. The majority seems to disre-

---

1. *United States v. Betancur,* 24 F.3d 73, 77 (10th Cir.1994). *But see State v. Howard,* 176 Wis.2d 921, 501 N.W.2d 9 (1993).

2. This was addressed in *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978): The Court in *Jones* was quite careful to note that "wrongful" presence at the scene of a search would not enable a defendant to object to the legality of the search.... 439 U.S. at 141 n. 9, 99 S.Ct. at 429.
   Obviously, however, a "legitimate" expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thor-

oughly justified subjective expectation of privacy, but it is not one which the law recognizes as "legitimate." 439 U.S. at 143 n. 12, 99 S.Ct. at 430 n. 12.

3. *See, e.g., People v. Tufts,* 717 P.2d 485 (Colo. 1986).

4. *United States v. Wagner,* 884 F.2d 1090, 1094–95 (8th Cir.1989) (ruse to enter house); *Northside Realty Associates, Inc. v. United States,* 605 F.2d 1348, 1354–55 (5th Cir.1979) (approved ruse to gain entry to office); *People v. Catania,* 427 Mich. 447, 398 N.W.2d 343 (1986) (ruse to enter house).

gard *Lewis* and *Hoffa* and take the position that deliberate deception is inconsistent with voluntariness.

The Court in *Lewis* distinguished *Gouled v. United States,* 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921). According to the Chief Justice, the government agent in *Gouled* represented that he was at defendant's office for "a social visit." After the defendant left the office, the agent "secretly ransacked" the premises to obtain incriminating papers. Under these circumstances the Court had "no difficulty" finding a Fourth Amendment violation. 385 U.S. at 209–10, 87 S.Ct. at 426. However, here Investigator Gambert did not gain entry to the house or rummage through the items in the house.

The majority's holding is contrary to most cases involving deception.[5] In this case we have a police officer who utilized a successful ploy. Had he been unsuccessful, there was probable cause to seek a warrant to authorize a search of the in-law's house to look for stolen property.

Certainly there are conflicting values and interests that are highlighted by this case. Public officials should not resort to tactics that violate standards of dignity or the right to privacy. It is unacceptable for police to engage in tactics that would result in coerced consent. The claim-of-authority cases reflect this standard.[6] On the other hand, law enforcement officials are tasked with combating crimes committed by individuals who are willing to violate norms expected of citizens in society today. In any event, this case is not an instance of deception to obtain consent for a general exploratory search.[7]

Here the police had ample probable cause to believe that appellant was involved in criminal activity. Their task was to ferret out crime and gather evidence so that the judicial process may be employed. No undue pressure was placed on appellant's wife. Gambert only described in generic terms the items to be brought to the police station. He had no right to and indeed did not insist that she come to the police station. Absent any claim that a reasonable person would feel compelled to go to the station house and none is made here, there is no coercion involved. This was not a claim of authority to search by the agent but rather a claim that her husband had asked her to bring the property to the police station. She hung up the phone. No one was there to remind her to bring the property. She had the option, among others, of doing nothing. In effect, her action was an exercise of her own free will. The majority would seem to adopt the "Fox–Hunter's" argument that suspects must be given a sporting chance. 5 J. Bentham, *Rationale of Judicial Evidence* 238–41 (1827; 1995 reprint); *see also* C. Fried, *Right and Wrong* 54–78 (1978).

Deception does not amount to coercion. Coercion takes place when, under an objective standard, a person would feel compelled to produce the evidence. *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Certainly it would have been preferable for the officer in this case to obtain a search warrant. That clearly would have satisfied the Fourth Amendment. Additionally, had the issue been fully litigated, it may have been established that if the ruse was not successful, the evidence would have been inevitably discovered. *See, e.g., United States v. Kozak,* 12 MJ 389 (CMA 1982); Mil.R.Evid. 311(b)(2), Drafters' Analysis, Manual, *supra* (1995 ed.) at A22–18. Because this case involves a conditional plea of guilty which is being set aside, double jeopardy does not preclude reinstatement of the original charges, *see, e.g., United States v. Scott,* 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d

5. *See* n. 4, *supra,* and nn. 6, and 7, *infra.*

6. *United States v. White,* 979 F.2d 539, 542 (7th Cir.1992) ("When the expressed intention to obtain a warrant is genuine, however, and not merely a pretext to induce submission, it does not vitiate consent."); *United States v. Faruolo,* 506 F.2d 490, 495 (2d Cir.1974) (ruse of threat to obtain warrant when "well founded" does not vitiate consent); *United States v. McClain,* 31 MJ 130, 133 (CMA 1990).

7. *United States v. Dichiarinte,* 445 F.2d 126 (7th Cir.1971).

65 (1978), and establishing application of inevitable discovery to all the items which were the subject of the search and seizure.

Deception is a question of degree and should be scrupulously avoided when it would lead to inducing unreliable evidence. The issue arises in the Fourth Amendment context,[8] Fifth Amendment Self–Incrimination Clause,[9] or the Due Process Clause of the Fifth Amendment.[10] The focus should be on the reliability of the evidence or, even if reliable, the offensiveness of police conduct.

The fact that a police tactic is successful is not an affront to human dignity when the police have probable cause to believe that appellant had stolen property. We should hesitate to use our supervisory power to suppress what is otherwise reliable evidence when there has been no rummaging through the house and the individual who is objecting to the search could not have been legitimately on the premises. There is nothing illegal about outfoxing the criminal and obtaining reliable evidence. Therefore, I would affirm the decision below.

**8.** *See, e.g., United States v. Payner,* 447 U.S. 727, 735, 100 S.Ct. 2439, 2446, 65 L.Ed.2d 468 (1980) (Supreme Court did not use its supervisory power to suppress evidence surreptitiously stolen from a brief case of a third party not before the Court).

**9.** *See, e.g., Moran v. Burbine,* 475 U.S. 412, 423–24, 106 S.Ct. 1135, 1141–42, 89 L.Ed.2d 410 (1986) ("Granting that the 'deliberate or reckless' withholding of information is objectionable as a matter of ethics, such conduct is only relevant to the constitutional validity of a waiver [under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966),] if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them."); *Frazier v. Cupp,* 394 U.S. 731, 737, 739, 89 S.Ct. 1420, 1423–24, 1425, 22 L.Ed.2d 684 (1969) (Justice Marshall,

writing for the majority, upheld the voluntariness of the confession even though the suspect was falsely told that his accomplice had confessed.).

In *On Lee v. United States,* 343 U.S. 747, 751–752, 72 S.Ct. 967, 970–71, 96 L.Ed. 1270 (1952), the issue was similar to the issue here. The Supreme Court summarily concluded that "Chin Poy entered a place of business with the consent, if not by the implied invitation, of" On Lee and that "the claim that Chin Poy's entrance was a trespass because consent to his entry was obtained by fraud must be rejected."

**10.** *See, e.g.,* in *United States v. Russell,* 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973) (Court explained: "[T]he defense of entrapment ... was not intended to give the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it did not approve.").